Andrew ADAMS, By his parent, Susan ADAMS, and Susan Adams, Plaintiffs,

v.

Robert A. HANSEN, Superintendent of the Napa Valley Unified School District; Napa Valley Unified School District; Austin Kelly, Director of Special Education, Napa Valley Unified School District; Jana Jack, Lynne Vaughan, Craig Templeton, Allan Knudsen, John Wagenknecht, Linda Mallett, Dorothy Searcy, Jay Goetting, individually and as members of the Board of Education of the Napa Valley Unified School District; The State of California Department of Education, Defendants.

No. C–85–3089 RFP.

United States District Court,
N.D. California.

Oct. 21, 1985.

Kathryn D. Dobel, Berkeley, Cal., for plaintiffs.

Diana K. Smith and Mark G. Intrieri, Breon, Galgani, Godino & O'Donnell, San Francisco, Cal., for defendant Napa Valley Unified School Dist.

John Klee, Deputy Atty. Gen., San Francisco, Cal., for defendant State of Cal. Dept. of Educ.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

PECKHAM, Chief Judge.

### BACKGROUND

This action involves a dispute about the appropriate education for Andrew Adams. Andy is a fifth-grade student who resides within the geographical boundaries of the Napa Valley Unified School District ("NVUSD" or "District"). He is nearly twelve years old, and was enrolled in District schools for six years. During that time, he repeated Kindergarten and third grade. He was identified at the end of the second grade as an individual with exceptional needs entitled to special education and related services under federal and state law. Andy is of average intelligence, but has a learning disability, specifically identified as "specific language disability," but more commonly referred to as dyslexia.

During his two years in the third grade, Andy was enrolled in a regular class, and had an "individualized education program" ("IEP") that called for daily contact with a resource specialist. From September 1982 through March 1984, he was pulled out of his regular class for up to sixty minutes a day to work with the resource specialist or an aide. In March 1984, pursuant to his mother's request for more intense services, he began to work with the resource special-

ist or aide for up to ninety minutes each day.

In Spring 1984, the parties met to discuss Andy's placement for the 1984–85 school year. In response to Susan Adam's request that her son be offered a non-public placement, the District suggested that she visit some of the special day classes within the district. The District also agreed to send district personnel to the Charles Armstrong School, a school that Mrs. Adams believed would provide her son with an appropriate education. Plaintiff visited Alta Heights School and later visited El Centro School. District personnel visited the Charles Armstrong School. By June 12, 1984, the parties had not resolved the issue of Andy's placement.

On June 20, 1985, Susan Adams unilaterally enrolled Andy in the Charles Armstrong School. She did not attend a meeting scheduled with district personnel on that day. On September 18, 1985, Mrs. Adams filed for a due process hearing, and mediation between the parties began.

During the mediation process, the parties reached agreement on all issues within the IEP, except the issue of when the plan would begin—i.e., when Andy would return to the District. A due process hearing was held, and the state hearing officer found that the District's proposed placement was appropriate. Plaintiffs seek review of that decision pursuant to section 615(e) of the Education of the Handicapped Act, 20 U.S.C. § 1415(e).

### FINDINGS OF FACT

The crux of the controversy is whether the District has an appropriate placement for Andy. There are several collateral issues that are important if the District has such a placement. The court will consider those first.

#### A. Mrs. Adams Unilateral Decision to Place Andy at the Charles Armstrong School

Defendants contend that the Susan Adams was not justified in removing her son from the District and unilaterally placing him in the Charles Armstrong School. They assert that, although Andy was progressing in the Resource Specialist (RS) Program, he was offered a special-day-class ("SDC") placement in the Spring of 1984. Defendants also assert that the IEP process was prematurely aborted by Susan Adams, depriving them of an opportunity to place Andy in a class where he could get an appropriate education.

Mrs. Adams, on the other hand, contends that the District had only recommended that Andy continue in the RS Program. Since she believed that the RS Program had not been productive for Andy, Mrs. Adams felt that it was necessary for her to place him elsewhere. She states that Andy was not offered an SDC placement until mediation in November 1985. Her testimony is corroborated by that of Ernest Wing, her advocate at the IEP meetings.

Upon a review of the testimony at the due process hearing and at trial, the court finds that the testimony of District witnesses is inconsistent, contradictory, and plagued by lapses in memory. It therefore resolves these disputed factual issues in favor of the more consistent and credible testimony of Susan Adams and Ernest Wing. Based on this testimony, and on consideration of assessment materials offered by both sides, the court finds: (1) that Andy did not make sufficient academic progress in the two years that he was in the RS Program; (2) that in spite of Andy's lack of progress in the RS program, it was the program recommended by the District on June 12, 1985; and (3) that the District did not recommend an SDC placement until after Andy had been enrolled in the Charles Armstrong School.

#### 1. Ineffectiveness of Resource Specialist Program

The ineffectiveness of the Resource Specialist Program is illustrated by Andy's lack of progress during the two years that he was in third grade. As measured by the Woodcock-Johnson battery of tests, Andy's academic growth over a period of 20 months was only 4 months in total reading,

and 8 months in math. When the same test was administered at the beginning of Andy's second year at the Charles Armstrong School, it indicated that Andy's growth in reading was more than 2 years for a similar period of time. This dramatic increase in Andy's academic rate of growth makes it clear that his prior lack of growth was due to the ineffectiveness of the RS Program.

The District offers Stanford Achievement Test ("SAT") scores as evidence that Andy made tremendous growth during the two years in third grade. Those scores suggest that Andy's growth in the first year of third grade was more than a year in reading and more than 2 years in both math and listening. His growth in the second year of third grade is shown to be almost 2 years in reading, more than a year in math, and 6 months in listening. The SAT scores show Andy as working above-grade level in all of these areas.

The SAT scores are contradicted by scores from other tests that are more consistent with each other, see Joint Exhibit 34; with the decision to keep Andy in third grade for an extra year; and with Andy's third-grade teacher's continued reservations, even after his second year in third grade, about his readiness for fourth grade. Moreover, Andy was measured against average third graders; and the District was unable to provide testimony that explained the effect of Andy's age and the extra year in third grade on the validity of the test scores. Plaintiff's expert witnesses, Arlee Maier and Ernest Wing, both testified that those factors would inflate the SAT scores. District personnel also indicated that other assessments, reflecting below-grade level achievement, were more accurate. See 3 Hearing Transcript 36 [hereinafter HT]; 5 HT 142; id. at 180.

## 2. Placement Recommended by the District

■ Even during the due process hearing, the District had a great deal of trouble keeping track of what it was and was not offering or recommending for Andy in terms of placement. After initially listing eight placements that would be available and appropriate for Andy, see 1 HT 34–36, including the RS Program and seven listed SDC's, the District later stated that the RS Program was not being offered, see 2 HT 138. As the hearing progressed, it became clear that the District was only recommending three programs: Alta Heights, El Centro, and Pueblo Vista Schools. Alta Heights was later withdrawn because of the teacher's health, and El Centro was withdrawn when a question arose as to whether the teacher there held appropriate credentials.

This type of inconsistency plagued the District's testimony about what programs were offered or recommended to Susan Adams. The district asserts that it offered an SDC placement in early Spring 1984. Yet, there is evidence that the team that assessed Andy at Mrs. Adams's request did not recommend at any IEP meeting that Andy be placed in an SDC. See 5 HT 204–05. Andy's third-grade teacher indicated that she had recommended a carefully chosen fourth-grade teacher and continuation in the RS Program. And, witnesses from both sides testified that Linda Barbour, a special education teacher in the diagnostic program who had helped assess Andy, had voiced the opinion that an SDC would be inappropriate because the students were more disabled than Andy. See 5 HT 207, 6 HT 60. There is also evidence that Robert Hansen, Superintendent of NVUSD, told Mrs. Adams that his staff did not believe that an SDC was an appropriate placement for Andy. See Joint Exhibit 18; see also 1 HT 128–29.

Throughout the state hearing and this trial, the District has maintained that either the RS Program or SDC would be appropriate for Andy. Given the District's equivocal position on what placement is appropriate for Andy, and the fact that the SDC's were shown to Mrs. Adams only in response to her request for a non-public placement, the court does not believe that Andy was offered an SDC placement in Spring 1984.

A great deal of testimony centered around whether and what the District had recommended for placement at the last IEP meeting before Andy was enrolled in Charles Armstrong School. Both Susan Adams and Ernest Wing testified that the facilitator, Tom Spencer, had taken a poll, and that the District members had each recommended continuing the RS Program. Mr. Spencer confirmed that it was his usual practice to take such a poll, but that he did not remember the results. Other District-employed members did not remember the poll, the results, or their own recommendations. That meeting ended without goals being written and without a written statement about the recommended placement. The court finds that Mrs. Adam's account of the two-and-one-half hour meeting, which is supported by testimony from both Mr. Wing and Mr. Spencer, is credible. That is, the parties were unable to write goals and objectives, because the District continued to recommend the RS program, and Ms. Adams would not accept that recommendation.

Finally, the District points to a letter from Nancy Reinke to Mrs. Adams dated August 22, 1984, as evidence that the District offered an SDC placement before the 1984–85 school year began. *See* Joint Exhibit 51. Although this letter states that the "recommendation ... is that we consider a special class placement for Andy," it is not clear whether the reference is to a special day class, or merely to a carefully chosen class such as that recommended by Phyllis Payne. Moreover, even if the phrase "special class" is construed to mean "special day class," the letter does not recommend such a placement, but merely that it be considered. Finally, it is clear from Mrs. Adams response, *see* Joint Exhibit 52, that she believed that the District was continuing to offer the RS Program. And there is no evidence of a responsive letter from the District contradicting that belief. Therefore, the court finds that the District did not offer an SDC placement to Andy until November 1984.

## B. Appropriateness of District Placements

■ The District asserts that Andy is a marginal student with a common disability, and that the RS Program and the SDC Program are equally appropriate. The District stated several times that there were other students with problems similar to Andy's, but no evidence was offered to support this statement. The court finds that, although there may be students within the District with problems of the same general nature, Andy's particular deficiencies are unique. The court also finds that the District has not offered a placement that will address Andy's unique needs.

Andy's specific language disability involves deficits in all three learning modalities—auditory, visual, and sensory-motor. Unlike many dyslexics, Andy has no relative strength in or preference for either the auditory or visual mode. Plaintiffs' experts testified that because of this lack of relative strength and the weakness in all modalities, Andy needs an intensive simultaneous multi-sensory approach. Each of these witnesses had personal contact with Andy and based his or her opinion on a personal assessment of him. These witnesses were of the opinion that the Pueblo Vista SDC was an excellent program, but not appropriate for Andy because it would not provide a sufficiently structured sequential simultaneous multi-sensory approach.

Defendants' expert witnesses were less helpful. Two that testified at trial had not personally assessed Andy, and could speak only in generalities after a review of his record. Such testimony does not outweigh the opinions of experts with personal knowledge of Andy's needs. Even the SDC teacher recommended for Andy by the District indicated that she would be unwilling to rely solely on the assessments in Andy's file, or offer an instructional plan for Andy until she had assessed him herself. One expert witness, Thomas Cooke, refused to accept the premise that Andy was equally deficient in each modality, and

was unresponsive to hypotheticals reflecting that diagnosis.

Testimony from District witnesses at the due process hearing also reflected some confusion or lack of knowledge about Andy's specific needs. It was clear that Gerald Perez was sometimes testifying about another youngster tested under similar circumstances at about the same time. *See* 5 HT 182–86; 6 HT 54; *id.* at 62. And Marge Plecki's testimony indicated that she was not sure of Andy's age. 6 HT 26–27. This is not unusual given the number of students for whom these witnesses must provide services. It does make it difficult, however, for this court to give such testimony great weight.

There was also conflicting testimony about the type of instruction that Andy would get in the Pueblo Vista School SDC. The District asserts that it can provide a structured, sequential, simultaneous multisensory approach for Andy at Pueblo Vista School. The SDC teacher, Arden Mowrey, indicated that she used a variety of techniques involving the three modalities. However, it became apparent from her testimony, and from the testimony of other witnesses, that she does not use a structured sequential simultaneous multi-sensory approach. There is also evidence that Andy would be distracted in her classroom because of the variety of activities that are going on at any given time. Finally, since the District has indicated that the RS and SDC programs are equally appropriate for Andy, the court assumes that similar results would be produced in either program. Thus, there is no reason to believe that the SDC would be any more effective than the RS Program has been.

The court has also considered evidence that while attending schools within NVUSD Andy developed behavioral problems due to his frustration at being unable to learn. This led, in March 1984, to the addition of 94–142 counseling services to Andy's IEP. Mrs. Adams testified that she would be concerned about Andy's self-esteem if he attended the Pueblo Vista SDC, because she heard the Pueblo Vista teacher

make discouraging comments to and about students, such as "You can't do this," and "They're sending his brains by mail." While it may have been an oversight by the defendants' counsel, that testimony went unchallenged and uncontradicted. The parties agree that Andy's self-esteem is of great importance, and it is clear that such comments would be detrimental to his continued progress.

On the other hand, the Charles Armstrong School has provided Andy with effective instruction, as indicated by the Woodcock-Johnson test scores, above, and other instruments used to assess Andy's academic growth. For example, the Wide-Range Achievement Test ("WRAT") indicated a growth over a period of seven months of 7 months in spelling, 8 months in math, and over a year in word recognition. Ms. Adams and Andy's present teacher, Mary Judd, indicate that Andy's behavior problems have disappeared, and that he indicates that he is proud of himself because he is learning and because he is more self-sufficient.

Defendants contend that the Charles Armstrong School is inappropriate for Andy because it relies on one type of instruction to the exclusion of others, and because all of the youngsters at the school have the same type of disability. The court finds these arguments unpersuasive. The Charles Armstrong School has been approved by the State of California for non-public placement by school districts of youngsters with dyslexia. As for the policy of relying on a single method of instruction, the court merely notes that it has been effective in teaching Andy. Finally, with respect to the contention that Andy cannot be "mainstreamed" at the Charles Armstrong School, the court has considered testimony showing that many of the students are not identifiable as learning disabled students. All are of average or higher intelligence, and many are working at grade level. Such students would be considered regular students in a public setting, in spite of their specific language disabilities. Thus the court finds that

Andy can be "mainstreamed" at Charles Armstrong School.

### CONCLUSIONS OF LAW

■ The Education of the Handicapped Act ("EHA" or "Act"), 20 U.S.C. § 1401 *et seq.*, requires a state receiving federal financial assistance thereunder to provide a "free appropriate public education" to all handicapped children within its borders. *Id.* § 1412. A "free appropriate education" consists of instruction specifically designed to meet the unique needs of the handicapped child, supported by such services as are necessary to permit the child to benefit from the instruction. *Hendrick Hudson District Board of Education v. Rowley,* 458 U.S. 176, 188–89, 102 S.Ct. 3034, 3041–42, 73 L.Ed.2d 690 (1982). The instruction and services must meet the State's educational standards, and comport with the child's "individualized education program" ("IEP"). 20 U.S.C. § 1401(18).

### A. Appropriate Education

In suits brought under the EHA, the court's inquiry is whether the responsible agency has created a plan which conforms with statutory requirements, and whether the IEP is reasonably calculated to enable the child to receive educational benefits. *Rowley,* 458 U.S. 206 & n. 27, 102 S.Ct. 3050–51 & n. 27. The court must make an independent determination of the appropriateness of the child's placement, and need not defer to the findings of administrative agencies. 20 U.S.C. § 1415(e)(2); *see also Age v. Bullitt County Public School,* 673 F.2d 141, 144 (6th Cir.1982). The issues in this trial are: (1) whether the provisions of the November 1984 IEP call for a simultaneous multi-sensory approach; (2) whether the IEP can be or could have been implemented within the District; (3) whether it can be or has been implemented at the Charles Armstrong School; and (4) whether the March 1985 IEP is appropriate.

### 1. Andy's IEP

■ During the mediation process, the parties agreed upon an IEP for Andy that states that he requires "[an] intensive multi-sensory approach, especially in reading and lang[uage] instruction; minimal distractions; auditory sequencing; visual-motor integration; small group instruction." Long range goals include participation in a regular classroom on a full-time basis with support services as needed, and the ability to write two paragraphs with correct capitalization, punctuation, spelling and grammar. After reviewing Andy's previous IEP's and the mediation agreement developed in conjunction with the November IEP meetings it is clear that when the parties used "intensive multi-sensory approach" they meant a simultaneous multi-sensory approach such as the one used at the Charles Armstrong School. None of Andy's prior IEP's had called for an intensive multi-sensory approach, and the only place that he had received that type of instruction was the Charles Armstrong School. Although the District contends that the mediation agreement is not part of the IEP, it was drafted contemporaneously and was originally intended to be incorporated. It must be viewed as a surrounding circumstance providing the background against which the IEP was signed. The specification in the mediation agreement calling for the use of the Slingerland approach, "with other multi-sensory approaches to be phased in," makes it clear that the parties had Slingerland-like approaches in mind.

### 2. The Appropriateness of Pueblo Vista's SDC

■ The District presented evidence that the Pueblo Vista teacher had been exposed to the Slingerland approach, but other testimony indicated that such exposure is insufficient to allow her to make effective use of the approach. She does not consistently use a simultaneous multi-sensory approach, and her responses at trial indicated that she did not feel such an approach was necessary. Therefore, the "intensive multi-sensory approach" required by Andy's IEP cannot be implemented at Pueblo Vista School.

■ Andy's IEP also calls for minimal distractions. He is easily distracted due to auditory attention deficits. Given the level of noise and distractions generated by a constant change in activities, the court finds that this aspect of Andy's IEP cannot be implemented at Pueblo Vista School.

### 3. The Appropriateness of Charles Armstrong School

■ The District contends that Andy's IEP cannot be implemented at the Charles Armstrong School because it calls for integration during recess, lunch, and sports programs with regular students. The District also questions whether Andy receives 20–30 minutes twice a week with a speech/language therapist as required by his IEP. This court has already indicated that Andy is integrated with regular students in class as well as at lunch, recess, and sports programs. And Carol Murray of the Charles Armstrong School indicated that a speech/language therapist works with Andy's class for more than the time required by his IEP. Finally, Andy's present teacher at the Charles Armstrong School, Mary Judd, testified that Andy has already met or exceeded the goals from the November IEP.

### 4. The Appropriateness of the March 1985 IEP

■ The March 1985 IEP is inappropriate because it lists goals and objectives that have already been met. Moreover, they are not ambitious enough given the rate of Andy's progress during the past year. The parties will need to meet and draft goals and objectives that are based on Andy's present level of achievement, and his expected growth based on appropriate instruction.

### B. Reimbursement After Unilateral Placement

Having determined that the District failed to offer an appropriate placement for Andy before he was enrolled in Charles Armstrong School, the court must now decide whether Susan Adams is to be reimbursed for the costs of Andy's education for the 1984–85 and 1985–86 school years. Section 615(e)(3) of the EHA, provides that "during the pendency of any proceedings conducted pursuant to [that] section, ... the child shall remain in the then current educational placement of such child, ..." 20 U.S.C. § 1415(e)(3). Many courts have read this provision to preclude reimbursement when the parent moves the child before the IEP process has been resolved in their favor. *See, e.g., Scokin v. State of Texas,* 723 F.2d 432 (1984); *Mountain View-Los Altos Union High School District v. Sharron B.H.,* 709 F.2d 28 (9th Cir.1983); *Newport-Mesa Unified School District of Orange County v. Hubert,* 132 Cal.App.3d 724, 183 Cal.Rptr. 334 (1982). However, the United States Supreme Court held recently in *Burlington School Committee v. Department of Educations,* —— U.S. ——, 105 S.Ct. 1996, 85 L.Ed.2d 385 (1985), that parental violation of § 1415(e)(3) does not constitute a waiver of reimbursement. 105 S.Ct. at 2004. Thus, retroactive reimbursement is an available remedy where the court determines that a private placement was proper. *Id.* at 2003.

■ The *Rowley* court held that if a child is being educated in the regular classrooms of the public education system, the IEP and personalized instruction should be reasonably calculated to enable the child to achieve passing marks and advance from grade to grade. 458 U.S. 203–04, 102 S.Ct. at 3049–50. Under this standard, it is clear that before Susan Adams enrolled Andy in the Charles Armstrong School he had been deprived of a "free appropriate public education" for at least two years. Moreover, in spite of this deprivation, the District failed to offer a more appropriate placement for the 1984–85 school year. Therefore, this court finds that Susan Adams was justified in moving Andy to the Charles Armstrong School, and that she is entitled to reimbursement of tuition and travel expenses for the Summer of 1984, and for the 1984–85 school year. The court also finds that the District currently does

not have a suitable placement or IEP for Andy, and that it would be inappropriate to change Andy's placement before the end of the current school year. Therefore, the court orders the school District to reimburse and/or pay Andy's tuition and transportation costs for the 1985–86 school year.

### C.  Attorney's Fees and Room and Board

██   Plaintiffs do not have a separate claim under 42 U.S.C. § 1983, and are not entitled to greater relief under section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, than they are under the EHA. Attorney's fees are not available under the EHA, which provides the exclusive remedy in a case of this kind. *Smith v. Robinson*, 468 U.S. 992, 104 S.Ct. 3457, 82 L.Ed.2d 746 (1984). Therefore, the plaintiffs are entitled to costs, but they are not entitled to attorney's fees.

██   Finally, since the Charles Armstrong School is a day school, Andy's placement in a private residence does not constitute a "related service" as defined in section 602 of the Act, 20 U.S.C. § 1401(17). Therefore, the plaintiffs are not entitled to reimbursement for room and board.

### CONCLUSION

Andrew Adams will remain at the Charles Armstrong School for the rest of the 1985–86 school year. He will return to the Napa Valley Unified School District at the beginning of the 1986–87 school year, if the District has an appropriate placement for him at that time. The cost of Andy's tuition and transportation while attending Charles Armstrong will be borne in the future by the District. The District shall reimburse Susan Adams for Andy's tuition and transportation costs for his attendance from June 1984 through the date of this decision. Finally, the parties will meet immediately to develop an appropriate IEP for Andy.

IT IS SO ORDERED.