MR. & MRS. ANTHONY LASCARI, INDIVIDUALLY AND ON BE-HALF OF THEIR SON, JOHN LASCARI, PLAINTIFFS–APPEL-LANTS, v. BOARD OF EDUCATION OF THE RAMAPO INDIAN HILLS REGIONAL HIGH SCHOOL DISTRICT, DEFENDANT-RESPONDENT.

Argued November 7, 1988—Decided July 24, 1989.

*G. Emerson Dickman* argued the cause for appellants.

*Allan P. Dzwilewski* argued the cause for respondent (*Green & Dzwilewski*, attorneys; *Jacob Green* of counsel).

*David B. Harris*, Deputy Public Advocate, argued the cause for amicus curiae Alfred A. Slocum, Public Advocate (*Alfred A. Slocum*, attorney).

*Ruth Lowenkron* submitted a brief on behalf of amicus curiae Community Health Law Project.

The opinion of the Court was delivered by

POLLOCK, J.

In May 1981 Anthony and Geraldine Lascari went to the Ramapo–Indian Hills Regional High School (Ramapo) to discuss why their son, John, could not read and what could be done

about it. Eight years later they are still waiting for an answer. After conferences with school officials, an administrative hearing in the Department of Education, two trials in the Law Division, and three appeals in the Appellate Division, John's right to an education remains unresolved. In the interim, John has attained his majority and completed his education.

Our purpose in this opinion is to bring this matter to a close and to provide sufficient guidance so that in the future parents, children, and school boards can decide more equitably and efficiently the rights of handicapped children to a public school education. Toward that end, we conclude that the school district has the burden of proving that it is providing an appropriate education to the child. We conclude further that the district did not satisfy that burden in this case, and that Mr. and Mrs. Lascari are entitled from the Board of Education of Ramapo–Indian Hills Regional High School District (the board or the district) to reimbursement for John's tuition, but not for his room and board, at a residential school.

## I

An explanation of the underlying statutory and regulatory scheme will aid comprehension of the relevant facts. Hence, we begin with a summary of state and federal regulations. A handicapped child is entitled to a panoply of rights conferred under the Education For All Handicapped Children Act of 1975 (EAHCA), *P.L.* 94–142, 89 *Stat.* 773, codified at 20 *U.S.C.* §§ 1401–61. Although education is primarily a concern of state and local governments, the education of handicapped children is regulated by a complex scheme of federal and state statutes and administrative regulations. Through the EAHCA, Congress has provided for cooperating states to receive federal funds to educate handicapped children. Receipt of the funds is conditioned on the State's compliance with EAHCA's goals and requirements. Thus, the education of handicapped children is an exercise in cooperative federalism.

New Jersey has elected to participate in the federal program to help finance the education of handicapped children. That participation is reflected in state statutes, *N.J.S.A.* 18A:46–1 to –46, and regulations, *N.J.A.C.* 6:28–1 to –11. *See D.S. v. East Brunswick Township Bd. of Educ.*, 188 *N.J.Super.* 592, 598 (App.Div.), certif. denied, 94 *N.J.* 529 (1983). Following adoption of EAHCA in 1975, the Department of Education amended the relevant regulations in 1978, 1984, and most recently on May 15, 1989. Because this opinion spans the periods when each of the regulations was in effect, we will cite, where appropriate, to the current regulations as well as to the earlier versions.

To receive federal funds, a State must demonstrate that it "has in effect a policy that assures all handicapped children the right to a free, appropriate education." 20 *U.S.C.* § 1412(1). The EAHCA mandates that the education be tailored to the unique needs of each handicapped child through an "individualized education program" (IEP), which must be reviewed annually. 20 *U.S.C.* § 1414(a)(5). The IEP is a written statement outlining the education placement and goals for the child. It is developed by a representative of the school board, the teacher, the child's parents, and, whenever appropriate, the child. 20 *U.S.C.* § 1401(19). The IEP should include

(A) a statement of the present levels of educational performance of the child, (B) a statement of annual goals, including short-term instructional objectives, (C) a statement of the specific educational services to be provided to such child, and the extent to which such child will be able to participate in regular educational programs, (D) the projected date for initiation and anticipated duration of such services, and (E) appropriate objective criteria and evaluation procedures and schedules for determining, on at least an annual basis, whether instructional objectives are being achieved. [*Ibid.*]

*See* 34 *C.F.R.* § 300.346.

Consistent with the federal requirements, State regulations provide that school districts are required to take the lead and to develop an appropriate IEP. *N.J.S.A.* 18A:46–8; *N.J.A.C.* 6:28–3.6(a) (1989, 1984); *N.J.A.C.* 6:28–1.8 (1978). The State regulations detail more fully the educational goals and objectives to

be included in the IEP and the action needed to meet them. *N.J.A.C.* 6:28–3.6 (1989, 1984); *N.J.A.C.* 6:28–1.8 (1978). Each district must provide educational programs and related services in accordance with its IEPs. *N.J.A.C.* 6:28–4.1 (1989, 1984); *N.J.A.C.* 6:28–2.1 (1978).

The State regulatory scheme provides for the initial evaluation and classification of a child by a "child-study team," which consists of a school psychologist, a learning disabilities teacher-consultant, and a school social worker. *N.J.A.C.* 6:28–3.1(b) (1989, 1984); *N.J.A.C.* 6:28–1.3 (1978). The child-study team determines whether a child is eligible for special education; it also develops, monitors, and evaluates the child's IEP. *N.J.A.C.* 6:28–3.1(a) (1989, 1984); *N.J.A.C.* 6:28–1.4 (1978); *N.J.A.C.* 6:28–1.8 (1978). Parents have the right to be involved in the formation of the IEP, 20 *U.S.C.* § 1401(19); 34 *C.F.R.* § 300.345; *N.J.A.C.* 6:28–2.3(e) (1989); *N.J.A.C.* 6:28–2.3(c) (1984); *N.J.A.C.* 6:28–1.8(g) (1978), and the team must meet with the parents of the handicapped child in developing the IEP, *N.J.A.C.* 6:28–3.6(c) (1989, 1984); *N.J.A.C.* 6:28–1.8 (1978).

Before the enactment of EAHCA, some school districts excluded handicapped children from public schools. *Burlington School Comm. v. Massachusetts Dep't of Educ.*, 471 *U.S.* 359, 373, 105 *S.Ct.* 1996, 2004, 85 *L.Ed.*2d 385, 397 (1985); *Mills v. Board of Educ. of Dist. of Columbia*, 348 *F.Supp.* 866, 868 (D.D.C.1972). A majority of handicapped children in the United States " 'were either totally excluded from schools or [were] sitting idly in regular classrooms awaiting the time when they were old enough to "drop out." ' " *Hendrick Hudson Dist. Bd. of Educ. v. Rowley*, 458 *U.S.* 176, 179, 102 *S.Ct.* 3034, 3037, 73 *L.Ed.*2d 690, 695 (1982) (citing *H.R.Rep.* No. 94–332, 94 Cong., 1st Sess. 2 (1975)). In effect, handicapped children were being "warehoused." *See Burlington, supra,* 471 *U.S.* at 373, 105 *S.Ct.* at 2004, 85 *L.Ed.*2d at 397; *S.Rep.* No. 94–168, 94th Cong., 2d Sess. 5–6, *reprinted in* 1975 *U.S.Code Cong. & Admin.News* (89 Stat.) 1425, 1429–30.

To remedy this problem, the EAHCA requires that "to the maximum extent appropriate, handicapped children * * * [should be] educated with children who are not handicapped * * *." 20 U.S.C. § 1412(5)(B). That precept is also manifested in federal and State regulations requiring that handicapped students be educated in the "least restrictive environment." 34 C.F.R. § 300.550; N.J.A.C. 6:28–2.10 (1989); N.J.A.C. 6:28–1.3, 3.6(e)5, 4.1(i)2 (1984); N.J.A.C. 6:28–2.2(b) (1978). Consistent with that requirement, State regulations require that handicapped children be educated in their local schools with non-handicapped children. N.J.A.C. 6:28–2.10(a) (1989); N.J.A.C. 6:28–3.6(e)5, 4.1(i)2 (1984); N.J.A.C. 6:28–2.2(b) (1978). Although the regulatory scheme manifests a clear preference for educating handicapped children "as close to home as possible," N.J.A.C. 6:28–2.10(a)(3) (1989); see also N.J.A.C. 6:28–3. 6(e)5ii(1) (1984) (placement shall be "as close as possible to the pupil's home"); N.J.A.C. 6:28–2.2(b)1 (1978) (pupil should be placed in a setting "as close to his/her home as possible"), it also recognizes that for some children residential placement in a boarding school may be the only way for them to receive an appropriate education. Thus, EAHCA and state regulations contemplate the possibility that a school board may be obliged to pay for a handicapped child's education at a boarding school. See 20 U.S.C. § 1401(16); 34 C.F.R. § 300.302, .551; N.J.A.C. 6:28–4.2(a) (1989, 1984); N.J.A.C. 6:28–2.2(c)7 (1978).

Through EAHCA, Congress sought to ensure that school districts would be held accountable for the proper education of handicapped children, a task the districts had previously ignored. See S.Rep. No. 94–168, 94th Cong., 2d Sess. 25–27, reprinted in 1975 U.S.Code Cong. & Admin.News (89 Stat.) 1449–50; Rowley, supra, 458 U.S. at 179, 102 S.Ct. at 3037, 73 L.Ed.2d at 695. Thus, a participating state must establish procedural safeguards for handicapped children and their parents. 20 U.S.C. 1415(a)–(e). The minimum procedures mandated by the EAHCA include parental access to relevant school records, notice to parents of any proposed change in a child's

educational placement, and the right to present complaints relating to the child's placement or provision of free, appropriate education. 20 *U.S.C.* § 1415(b)(1). When a dispute arises between the board and the parents, either party has the right to resolve the matter through an administrative proceeding known as an "impartial due process hearing." 20 *U.S.C.* § 1415(b)(2). Under the New Jersey regulations, when parents of a handicapped child are dissatisfied with his or her education, they have the right to request a mediation conference, *N.J.A.C.* 6:28–2.6 (1989, 1984); *N.J.A.C.* 6:28–1.9(h) (1978), or to request the due-process hearing, *N.J.A.C.* 6:28–2.7 (1989, 1984); *N.J.A.C.* 6:28–1.9 (1978).

A party aggrieved by the due process hearing may bring a civil action in state or federal court. 20 *U.S.C.* § 1415(e)(2). The court conducts an independent review of the case, but should give "due weight" to the findings of the administrative agency. *Rowley, supra,* 458 *U.S.* at 206, 102 *S.Ct.* at 3053, 73 *L.Ed.*2d at 712. Against that legal background, we turn to the facts of this case.

## II

John attended kindergarten through eighth grade in the Franklin Lake School District. In the second grade, he was classified as "neurologically impaired," and in the seventh and eighth grades he was placed in a class for the "perceptually impaired." He was graduated from grade school in June 1980.

In anticipation of his enrollment at Ramapo, John was evaluated by a child-study team consisting of a learning-disability specialist, a social worker, and a psychologist. He was also examined by a pediatric neurologist. These examinations revealed that John suffered from "a neurologic dysfunction in the form of a marked dyslexia [with] associated difficulties in auditory perceptual skills," and from "low self-esteem." Although tests revealed his I.Q. was 126, John read at second-

grade level and felt "segregated" from other students because he had been placed in the perceptually-impaired program.

After discussing the matter with Mr. and Mrs. Lascari, Ramapo designed an IEP, which had five goals: (1) to continue a phonetic-linguistic reading program to strengthen skills; (2) to develop math skills to include all areas necessary for practical math; (3) to develop a language arts program; (4) to build self-esteem and self-worth; and (5) to develop vocational skills.

Pursuant to the IEP, in September 1980 John entered Ramapo's program for the perceptually impaired. A special education teacher taught him reading, mathematics, and language arts. His shop and physical-education classes were with non-handicapped children.

Towards the end of the school year, on May 12, 1981, Mr. and Mrs. Lascari met with Ramapo officials to review John's IEP for 1981–82. As a result of that meeting, Ramapo agreed to provide John with a more intensive reading and writing program, to eliminate a vocational training program, and to "integrate" John as much as possible with the other students. Because of their continuing concern that John was not receiving sufficient academic instruction, the Lascaris refused to agree to the proposed IEP for 1981–82. Through an attorney, Mr. and Mrs. Lascari requested a review of his 1981–82 IEP. Underlying the request was their concern that John still read at a second-grade level and that he had not received proper training to overcome his dyslexia.

Tests conducted in January, May, and June 1981 revealed that John's progress in the 1980–81 school year was insignificant. Essentially, the tests showed that he still read at a second-grade level and that his mathematics skills were at a fourth-grade level.

At a meeting on August 18, 1981, the Lascaris told Ramapo's Director of Special Services that they were contemplating enrolling John at the Landmark School, a private school in Massachusetts that specializes in teaching children with severe dysle-

xia. The parties disagree on the critical issue whether Mr. Lascari asked whether Ramapo would pay for John's expenses at Landmark.

On September 9, 1981, the Lascaris requested a due-process hearing, in which they sought reimbursement for tuition and residential costs at Landmark. Ramapo wrote to the Lascaris advising them that it believed its IEP was appropriate for John and confirming that John was enrolled at Landmark. On September 18, 1981, John started school at Landmark.

At present, the Office of Administrative Law (OAL) is responsible for due-process hearings. *N.J.A.C.* 6:28–2.7(b)4.iv (1989); *N.J.A.C.* 6:28–2.7(a)6 (1984). Before July 1982, however, due-process hearings were conducted by classification officers who were employees of the State Board of Education. *N.J.A.C.* 6:28–1.9(j)(1) (1978) (repealed). Accordingly, the due-process hearing commenced on January 7, 1982, before the chief classification officer in the Department of Education. While the hearing was in progress, the United States District Court for the District of New Jersey ruled that such hearings should not be conducted by employees of the State Board of Education. The federal court held that use of the department's officers violated the requirement of EAHCA that due-process hearing officers be independent of the state education agency. *East Brunswick v. New Jersey Bd. of Educ.*, No. 81–3600 (D.N.J. July 7, 1982); *see also* 20 *U.S.C.* § 1415(b)(2) ("No hearing conducted pursuant to the requirements of this paragraph shall be conducted by an employee of [the educational] agency or unit involved in the education or care of the child."). Notwithstanding the ruling of the federal court, the Lascaris requested that the matter continue before the classification officer. In its first review of this matter, the Appellate Division ruled that the classification officer could continue to conduct the hearing.

Relying on the 1978 regulations, the classification officer determined on April 6, 1983, that Ramapo's IEP failed to

specify clearly the educational goals and objectives for John as well as the manner of measuring his progress. The classification officer found that the evaluations of John's progress by the Ramapo teachers and psychologists were deficient because they were subjective. Objective test scores indicated that John had failed to progress in word recognition, spelling, or mathematics. The officer found further that the five goals set forth in the 1980–81 IEP were incapable of objective measurement and that Ramapo probably had not intended John's mastery of those goals. Although the 1981–82 IEP was more specific, the officer found that it, too, was flawed.

Based on these findings, the officer concluded that "[n]either [IEP] complies fully with *NJAC* 6:28–1.8 [1978] in that current educational performance is not indicated, no rationale for placement is stated, no statement as to how the placement is the least restrictive environment is made, and the instructional guide for each falls short of requirements." Although he found fault with the district, the officer also criticized the actions taken by the Lascaris.

As to them, he found that they "acted unilaterally and without undue pressure to place [John] in the Landmark School." The classification officer determined that there was no indication that John required placement at a residential facility.

Consequently, the officer concluded:

Respondent [Ramapo] has erred in providing a program incapable of being evaluated for appropriateness. It has also placed a neurologically impaired pupil in a class for perceptually impaired without special approval. Further, important instructional strategies delineated in testimony are nowhere mentioned in the IEP. They are the calculator, one-to-one reading instruction, the types of special reading materials and assignments, and testing arrangements. These errors, however, do not justify petitioners' [the Lascaris'] unilateral selection of a residential placement.

    *  *  *  *  *  *  *  *

The Landmark program has not shown itself to be a panacea either. J.L.'s [John's] disability hinders his capacity to deal with written language. The program offered at Ramapo was not demonstrated as improper, only as

nonspecific in its written aspirations and evaluation of effectiveness. This is not sufficient to warrant payment of tuition and/or residential costs incurred voluntarily and unilaterally by petitioners. They should have invoked their right to due process earlier if they sought an alternate to the May 1981 placement proposal.

The net result of the classification officer's decision was that the Lascaris' request for reimbursement for tuition and residential expenses at Landmark was denied.

Pursuant to 20 *U.S.C.A.* § 1415(e)(2), the Lascaris appealed the classification officer's decision to the Superior Court, Chancery Division. After reviewing the administrative record, the court, in an unreported opinion, found that "the education system from the time this child entered school was just pushing him along." In effect, John had been "warehoused" since the second grade. The court agreed with the classification officer's findings

with respect to the dereliction of the school in the preparation of the IEP, in preparation of the classes that were needed. I certainly have no difficulty in finding the school ignored the parents after May of '81 * * *. I don't think anybody can come to a conclusion other than that no progress was made in the first year at Ramapo and that the proposal for the second year was, basically, more of the same * * * and there is certainly within this record sufficient evidence to conclude that the Ramapo Indian Hills School Board could have provided a like setting or a similar type educational program [as Landmark], the only difference between what could have been done here and is done at Landmark for day students is the educational part of it.

Consequently, the court held that Ramapo had failed to design an appropriate IEP for John, and that his parents should be reimbursed for the tuition but not for his room and board at Landmark. The parties agreed on the cost of tuition, and the court entered a judgment directing Ramapo to reimburse them "for the cost of educational tuition payments made to the Landmark School for their son, John P. Lascari, for the school years 1981–1982, 1982–1983, 1983–1984, to wit, $34,450.00."

Ramapo appealed to the Appellate Division and the Lascaris cross-appealed, seeking reimbursement for John's residential expenses. The Appellate Division vacated the Chancery Division's order and remanded the matter for a new trial on the record. In remanding, the Appellate Division stated:

Our review of this matter has satisfied us that the judge did not make findings sufficient to impose liability on defendant for the placement of John at Landmark. To start with he never indicated that it was possible for John to obtain an appropriate education at Landmark but not within defendant's system. Instead he was simply critical of defendant's program. There is nothing in the findings comparing with any specificity the education at Landmark with that in defendant's system and explaining why Landmark was the appropriate facility. Nor did the judge really consider what would be the least restrictive environment for John. It seems obvious to us that living at home and attending public school would be far less restrictive than being sent to a boarding school. While we recognize that in some cases a residential school would be required and would thus be the least restrictive environment, there are no findings supporting that conclusion here.

We also conclude the judge's findings to support his conclusion that plaintiffs were justified in unilaterally enrolling John in Landmark were inadequate. Even if we found that as a substantive matter the Landmark placement was appropriate, there is a separate question of whether some other placement at a lesser expense might not have also been appropriate.

On remand, the trial court described the conflict between its earlier ruling and that of the Appellate Division as one involving the burden of proof. It stated:

[The Appellate Division] began from the position that it was [plaintiffs'] duty to prove the negative and if that is the position that they have taken, then there is nothing in the record to prove the negative. I took the position in ruling in [plaintiffs'] favor that it was the Board's duty to show that there was something suitable for this child within reasonable distance, less restrictive of his freedom, keeping him at home instead of a boarding school and so forth, the Board didn't show that. * * * [B]ut as I read the Appellate Division, they say basically you prove that there wasn't something local and if you don't prove that then you don't have a right to send the kid to the boarding school.

Based on its reading of the Appellate Division's holding, the trial court dismissed the Lascaris' claim. In denying the Lascaris' motion for reconsideration on November 14, 1986, the lower court explained more fully its interpretation of the Appellate Division's opinion:

There is ample evidence outlined in the Appellate Division opinion to establish that the school district failed to provide an appropriate education up to the 1981–1982 school year. There is nothing in the record to indicate that the School District's proposal from 1981–1982 would provide an appropriate education for John. The thrust of the Appellate Division decision is that the burden is on the plaintiff to prove that the School District was not able to provide an appropriate education.

\*  \*  \*  \*  \*  \*  \*  \*

> The Appellate Division has stated that the trial court did not consider what would be the least restrictive environment for John. This Court had before it a proposed program by the School District which had, in its opinion, been established as a failure. No other alternatives were suggested by the School District which is presumed to have expertise. By inference, the Appellate Division requires the plaintiff to establish that there are other less restrictive environments than the boarding school which other experts had recommended for their son.

The Lascaris appealed to the Appellate Division, which affirmed the dismissal of their complaint. We granted certification, 110 *N.J.* 319 (1988).

### III

As indicated, the State and federal statutory and regulatory schemes outline a district's obligation to educate handicapped children. Nowhere, however, do the statutes or regulations address the basic issue before us, the allocation of the burden of persuasion or proof. The Appellate Division assumed that the burden rested on the parents to prove the inappropriateness of a placement and of an IEP. Consequently, that court concluded that to be entitled to reimbursement, the parents must show that a district would be unable to provide an appropriate education and that the selected residential facility offers the least restrictive environment. The court also suggested that parents select one of the least-expensive private alternatives.

Across the country other courts have struggled with determining which party bears the burden of proving the appropriateness or inappropriateness of the education provided by the district. *See McKenzie v. Smith,* 771 *F.*2d 1527, 1531 (D.C.Cir. 1985) (where district sought to change child's IEP, it bore burden of demonstrating that the proposed placement was reasonably calculated to enable child to receive educational benefits); *Grymes v. Madden,* 672 *F.*2d 321, 322 (3rd Cir.1982) (accepting district court's decision that the district had "failed to sustain its burden of proof that an appropriate public program existed"); *Bales v. Clarke,* 523 *F.Supp.* 1366, 1370 (E.D.

Va.1981) (burden on parents to show that placement is inappropriate).

In cases in which the district has sought to change a child's placement, some courts have allocated the burden of proof to the district. That allocation is supported by the view that when a child is currently learning in a placement that was jointly developed by the district and the parents, the party attacking the program should show why it is inappropriate. *See, e.g., Tatro v. State of Texas,* 703 *F.*2d 823, 830 (5th Cir.1983), *aff'd in part, rev'd in part on other grounds sub nom. Irvington Indep. School Dist. v. Tatro,* 468 *U.S.* 883, 104 *S.Ct.* 3371, 82 *L.Ed.*2d 664 (1984); *Burger v. Murray County School Dist.,* 612 *F.Supp.* 434, 437 (D.C.Ga.1984); *Lang v. Braintree Comm.,* 545 *F.Supp.* 1221, 1228 (D.C.Mass.1982). In placing the burden on the district when it attacks the IEP, those courts have also relied on the statutory preference for maintaining the status quo when the child is receiving an appropriate education. *See* 20 *U.S.C.* § 1415(e)(3). Although we agree with the results of those cases, we are not certain that the courts would have placed the burden of proof on the party seeking to change the IEP if that party had been the parents rather than the school district. We need not, however, dwell on that point. The reason is that we believe it is more consistent with the State and federal scheme to place the burden on the school district not only when it seeks to change the IEP, but also when the parents seek the change.

Various considerations lead us to that conclusion. Underlying the State and federal regulations is an abiding concern for the welfare of handicapped children and their parents. Consistent with that concern, the basic obligation to provide a handicapped child with a free, appropriate education is placed on the local school district. It is the district that must identify handicapped children and then formulate and implement their IEPs. Finally, the regulatory scheme vests handicapped children and their parents with numerous procedural safeguards. Those

safeguards include the right to counsel and to the advice of experts, 20 *U.S.C.* § 1415(d)(1); 34 *C.F.R.* § 300.508(a)(1); to present evidence and cross-examine witnesses, 20 *U.S.C.* § 1415(d)(2); 34 *C.F.R.* § 300.508(a)(2); to "have the child who is the subject of the hearing present," *id.* at § 300.508(b)(1); and to a public hearing, *id.* at § 300.508(b)(2). Like those procedural safeguards, the allocation of the burden of proof protects the rights of handicapped children to an appropriate education.

Our result is also consistent with the proposition that the burdens of persuasion and of production should be placed on the party better able to meet those burdens. In the past, we have placed either the burden of production, *see Ryan v. Mayor & Council of Borough of Demarest*, 64 *N.J.* 593, 604–05 (1966), or the burden of proof on the party with the better access to relevant information, *Andersen v. Exxon Co.*, 89 *N.J.* 483, 500 (1982); *Brundage v. New Jersey Zinc Co.*, 48 *N.J.* 450, 475–77 (1967). The school board, with its recourse to the child-study team and other experts, has ready access to the expertise needed to formulate an IEP. Through the child-study team, the board generally has extensive records pertaining to a handicapped child. The board is also conversant with the federal and State laws dictating what the district must provide to handicapped children in order to comply with the EAHCA. *Cf. S–1 v. Turlington*, 635 *F.*2d 342, 348–49 (5th Cir.) (burden on district to raise question whether student's misconduct is based on handicap because parents lack wherewithal to know rights under EAHCA), *cert. denied*, 454 *U.S.* 1030, 102 *S.Ct.* 566, 70 *L.Ed.*2d 473 (1981), *abrogated on other grounds by Honig v. Doe*, 484 *U.S.* 305, 108 *S.Ct.* 592, 98 *L.Ed.*2d 686 (1988). By contrast, parents may lack the expertise needed to formulate an appropriate education for their child.

Although the posture of the district in the present case is that of a defendant, the nature of the proceedings suggests that it is not asking too much to require it to carry the burden of proof. These matters are initiated as administrative proceed-

ings and reviewed by a court sitting without a jury. Consequently, the allocation of the burden of proof may not be as important to trial strategy as it would be in other proceedings, such as a jury trial. Furthermore, both the parents and the district have an interest in assuring that a handicapped child receives an appropriate education. In that setting, the adversary nature of the proceedings should yield to obtaining the right result for the handicapped child. Thus, the distinction between the burden of proof and the burden of production may be less critical than it would be in another context. To conclude, we believe the obligation of parents at the due-process hearing should be merely to place in issue the appropriateness of the IEP. The school board should then bear the burden of proving that the IEP was appropriate. In reaching that result, we have sought to implement the intent of the statutory and regulatory schemes.

We also conclude that in determining whether an IEP was appropriate, the focus should be on the IEP actually offered and not on one that the school board could have provided if it had been so inclined. Consistent with that proposition, *N.J.A.C.* 6:28–4.8 (1978), which was in effect at the time of the Lascaris' due-process hearing, excused a school district from responsibility for the cost of private school placement if the district "offered" a free, appropriate education, not if it "could offer" such an education. Other courts that have addressed the issue of the appropriateness of the district's education likewise have focused on the IEP actually provided and not on a hypothetical one that the board could provide. *Burlington, supra,* 471 *U.S.* at 374, 105 *S.Ct.* at 2004, 85 *L.Ed.*2d at 397; *Rowley, supra,* 458 *U.S.* at 206–07, 102 *S.Ct.* at 3050–51, 73 *L.Ed.*2d at 712; *Tatro, supra,* 703 *F.*2d at 830; *Adams by Adams v. Hansen,* 632 *F.Supp.* 858, 865, 866 (N.D. Cal.1985); *Davis v. Board of Educ.,* 530 *F.Supp.* 1209, 1212 (D.D.C.1982). *But see Bales, supra,* 523 *F.Supp.* at 1370 (holding without explanation that parents who challenge IEP and seek private school placement bear the burden "to establish

that the [public school] is inappropriate, that no other state facility is appropriate, and that [the private school selected] is appropriate"). In short, a school board that has failed to meet its obligation to provide an appropriate education should not escape liability by showing that it could have done so.

A remaining question is the standard to be applied in determining whether an IEP is appropriate. Federal law requires that the education offered to a handicapped child must be "sufficient to confer some educational benefit." *Rowley, supra,* 458 *U.S.* at 200, 102 *S.Ct.* at 3048, 73 *L.Ed.*2d at 708. Although the federal government furnishes a basic floor of educational opportunity, states may construct a higher ceiling. *Id.* at 201, 102 *S.Ct.* at 3047, 73 *L.Ed.*2d at 708; *Geis v. Board of Educ. of Parsippany–Troy Hills,* 774 *F.*2d 575, 582 (3rd Cir.1985). Accordingly, the 1978 regulations expressly required school districts to provide an education "according to how the pupil can best achieve success in learning * * * " (the "best achieve success-in-learning" standard). *N.J.A.C.* 6:28–2.1(a)1; *Geis, supra,* 774 *F.*2d at 583 (interpreting best achieve success-in-learning test to impose higher standard on New Jersey school boards). Thus, when the due-process hearing began in January 1982, the board was obligated to provide John with an education that would allow him to best achieve success in learning.

The classification officer, the trial court, and the Appellate Division applied the "best achieve success-in-learning" test, and the Board did not cross-petition from the Appellate Division's recourse to that standard. At oral argument, moreover, the board conceded that the higher standard was in effect when the Lascaris leveled their challenge. Because the board did not challenge the Appellate Division's use of the "best achieve success-in-learning" standard, we need not decide if the lower federal standard applies retroactively in the Lascaris' case.

For the future, we note that the Department of Education has adopted new regulations, which took effect after oral

argument on May 15, 1989. One of those regulations, *N.J.A.C.* 6:28–1.1, adopts the federal standard, which *Rowley* defines as an education from which the child could benefit. 458 *U.S.* at 200, 102 *S.Ct.* at 3048, 73 *L.Ed.*2d at 708. Previously, the United States Court of Appeals for the Third Circuit had interpreted the New Jersey statutory and regulatory scheme as providing a higher level of education. *Board of Educ. E. Windsor Regional School v. Diamond,* 808 *F.*2d 987, 992 (3d Cir.1986). As the comments to the 1989 regulations make clear, the Department of Education disagrees with that interpretation. The relevant comment states that "it is necessary to clarify that the standard in *N.J.A.C.* 6:28 has been the same as the Federal standard." 21 *N.J.R.* 1385, 1391 (May 15, 1989). In light of the adoption of the 1989 regulations, we need not review the accuracy in *Diamond* of the Third Circuit's interpretation of the 1984 regulations.

### IV

█ Turning to the facts of this case, the classification officer found that the district erred by "providing a program incapable of being evaluated for appropriateness." The officer concluded, however, that the district's offered program "was not demonstrated as improper, only as nonspecific in its written aspirations and evaluation of effectiveness." In contrast, the trial court found that the district failed to provide an appropriate education through 1980–81 and that the proposal for 1981–82 was also inappropriate. We agree.

As previously indicated, the purpose of the IEP is to guide teachers and to insure that the child receives the necessary education. *See* 34 *C.F.R.* § 300.346; *N.J.A.C.* 6:28–3.8 (1989) (related services shall be provided according to child's IEP); *N.J.A.C.* 6:28–3.7 (1984) (same); *N.J.A.C.* 6:28–2.1 (1978) (same). Without an adequately drafted IEP, it would be difficult, if not impossible, to measure a child's progress, a measurement that is necessary to determine changes to be made in the next IEP.

Furthermore, an IEP that is incapable of review denies parents the opportunity to help shape their child's education and hinders their ability to assure that their child will receive the education to which he or she is entitled.

Consequently, the shortcomings that rendered John's program incapable of review also rendered it inappropriate. As the classification officer found, "[w]hat it [sic] is not clear from the IEP or testimony are the specific goals and objectives either the child study team or the teacher had for [John]. Equally unclear is how any goals or progress was to be measured or decided." The officer continued:

> All teacher remarks are found to be subjectively based. * * * [T]he goals and objectives of the IEP for 1980–81 and the proposed plan for 1981–82 were so vague that they were meaningless.
>
>    \*      \*      \*      \*      \*      \*      \*      \*
>
> Neither document complies fully with NJAC 6:28–1.8 [1978] in that current educational performance is not indicated, no rationale for placement is stated, no statement as to how the placement is the least restrictive environment is made, and the instructional guide for each falls short of requirements.

For its part, the trial court found that John had been "warehoused" and that the district had failed to provide sufficiently individualized instruction in academic subjects. Based on the inadequacies as found by the classification officer and the trial court, we likewise conclude that the district failed to provide an education that would help John best achieve success in learning.

## V

The determination that the district failed to provide John with an appropriate IEP leads to the question of the Lascaris' right to reimbursement for the cost of their son's private education. That right to reimbursement is grounded in the statutory grant of power to state and federal courts to "grant such relief as the court determines appropriate." 20 *U.S.C.* § 1415(e)(2). As interpreted by the United States Supreme Court, that statute entitles parents to reimbursement for the cost of private schooling during the pendency of any proceed-

ings if it is later determined that the education offered by the district was inappropriate. *Burlington, supra,* 471 *U.S.* at 370, 105 *S.Ct.* at 2003, 85 *L.Ed.*2d at 395. Otherwise, parents would be forced to choose between an inappropriate, free public education or providing their child with an appropriate education at their own expense. *Ibid.* That dilemma is inconsistent with the EAHCA's purpose of providing handicapped children with a free and appropriate education. *Ibid.* Reimbursement for the cost of private schooling, which ensures that a child will receive an adequate education while administrative and judicial proceedings are pending, is therefore appropriate. *Burlington, supra,* 471 *U.S.* at 370, 105 *S.Ct.* at 2002–03, 85 *L.Ed.*2d at 395.

The issue of financial responsibility for the cost of the private education should be addressed at the due-process hearing. *See* 34 *C.F.R.* § 300.403(b). Although it has not defined the showing parents must make to obtain reimbursement for the cost of private schooling, the United States Supreme Court has stated that if parents "pay for what they consider to be the appropriate placement," it "would be an empty victory to have a court tell them several years later that they were right but that these expenditures could not in a proper case be reimbursed by the school officials." *Burlington, supra,* 471 *U.S.* at 370, 105 *S.Ct.* at 2002–03, 85 *L.Ed.*2d at 395. That statement is consistent with the goals and purposes of the federal and State schemes for the education of handicapped children. Thus, if the board fails to meet its burden of establishing the appropriateness of its program and if the parents demonstrate that they have acted in good faith, the district should be liable for the cost of the private school placement of a handicapped child. *Town of Burlington v. Department of Educ., Commonwealth of Mass.,* 736 *F.*2d 773, 799 (1st Cir.1984) (parents who attempted in good faith to reach an agreement with school system regarding child's IEP entitled to reimbursement for subsequent private placement), *aff'd,* 471 *U.S.* 359, 105 *S.Ct.* 1996, 85 *L.Ed.*2d 385 (1985) (affirming reimbursement as appropriate relief, but not commenting on parents' duty to act in good

faith); *see also A.N. v. Clark Bd. of Educ.*, OAL Dkt. No. EDS 10941–82, Agency Dkt. No. 82–981 (March 23, 1983) (ALJ found residential placement necessary and awarded parents reimbursement without discussing whether parents must prove the private program is appropriate); *M.B. v. Board of Educ. of Pascack Valley Regional School Dist., Bergen County*, 1981 *S.L.D.* 752 (Commissioner of Education Decision, June 22, 1981) (because board failed to provide an IEP well into child's senior year, failed to re-evaluate child, and failed to comply with IEP requirements, parent entitled to reimbursement for private placement; no discussion of appropriateness of selected private school); *E.E. by his parents v. Board of Educ. of the Borough of Metuchen, Middlesex County*, 1980 *S.L.D.* 1269 (Commissioner of Education Decision, Nov. 3, 1980) (parent entitled to reimbursement where board failed to evaluate son despite its responsibility to do so; no discussion as to whether parent was required to show private placement was appropriate); *Board of Educ. of the Village of Ridgewood, Bergen County v. Arthur and Elyse Hecht*, 1980 *S.L.D.* 1260, OAL Dkt. No. EDU 3816–80, Agency Dkt. No. 197–5/78 (Sept. 9, 1980) (parents awarded tuition reimbursement for period in which the district failed to offer appropriate placement due to unreasonable and unjustifiable delay; no discussion whether parents were required to prove private placement was appropriate); *J.G. v. Board of Educ. of the Borough of Pompton Lakes, Passaic County*, 1979 *S.L.D.* 105 (Commissioner of Education Decision, Feb. 12, 1979) (parents awarded tuition for private placement where child faced possible harm due to district's failure to provide appropriate placement and there was conflicting professional opinion; no discussion concerning whether selected private placement was appropriate).

Here, the district contends that the Lascaris should not be reimbursed for the cost of John's schooling at Landmark because it did not provide him with an education in the least restrictive environment. The major premise underlying that contention is that parents are not entitled to any reimburse-

ment if they send their child to a boarding school unless residential placement is necessary for the education of their child. If residential placement is not necessary, so the argument proceeds, it does not provide an education in the least restrictive environment and is, therefore, inappropriate. With specific reference to this case, the district contends that it was not necessary for John to attend an out-of-state boarding school.

We are sensitive to the possibility that parents may select a private school that affords their child an education that is more elaborate than is required. Conceivably, parents might select a boarding school even though a day program would furnish their child with an appropriate education. It would be anomalous, however, to recognize the parents' right to reimbursement, but to deny completely that right merely because they selected a school that furnished an education beyond that which the district is obliged to offer. *See Alamo Heights Indep. School Dist. v. State Bd. of Educ.*, 790 *F.*2d 1153, 1161 (5th Cir.1986). It would also be anomalous to deny parents the right to reimbursement when the district failed to provide their child with an appropriate education and the only school that the parents could find was a boarding school. Hence, we reject the district's argument that the Lascaris are necessarily precluded from all reimbursement because they did not select the least restrictive environment for the education of their child.

Because the reviewing court may grant "appropriate" relief under 20 *U.S.C.* § 1415(e)(2), its award can be informed by equitable considerations. Several courts have held that it is appropriate to balance the equities in determining whether to grant full or partial reimbursement for the cost of private schooling. *See Muth v. Central Bucks School Dist.*, 839 *F.*2d 113, 126–27 (3d Cir.1988), *rev'd on other grounds sub nom. Dellmuth v. Muth*, — *U.S.* —, 109 *S.Ct.* 2397, 105 *L.Ed.*2d 181 (1989); *Jenkins by and through Jenkins v. State of Fla.*, 815 *F.*2d 629, 630–31 (11th Cir.1987); *Alamo Heights, supra*, 790 *F.*2d at 1161; *Burlington, supra*, 736 *F.*2d at 801, *aff'd,*

471 *U.S.* 359, 105 *S.Ct.* 1996, 85 *L.Ed.*2d 385; *cf. Colin K. by John K. v. Schmidt,* 715 *F.*2d 1, 7–8 (1st Cir.1983) (court's order to continue placement at Landmark while district reformulated IEP reflected "sensible accommodation" of state's interest in shaping IEP and child's interest in receiving "sufficient educational attention while those programs are being developed"). We agree.

In balancing the equities, the court or the ALJ may consider whether the private placement selected was the least restrictive alternative. For some children, placement in a boarding school may be the least restrictive alternative. Parents who find an education for their child in a boarding school need not be barred from any reimbursement merely because their child did not require residential placement. Their right to reimbursement may, however, be limited. Unnecessary placement in a boarding school may decrease the amount of reimbursement, but it need not preclude partial reimbursement if the school meets the child's educational needs.

██ Consistent with the preceding analysis, we conclude that the Lascaris are entitled to reimbursement for the cost of tuition, but not for room and board at Landmark. At no time has the board questioned the academic program offered by Landmark. In fact, the board sought to establish the appropriateness of its own program by proving that it was similar to the Landmark program. As explained above, we reject the board's argument that Landmark, as an out-of-state residential school, did not offer the least restrictive environment. Because the district's program was inappropriate, the Lascaris were forced to find alternative private schooling for their son. Confronted with this stressful decision, they did their best. We should not ask for more.

In denying the Lascaris the right to reimbursement for the cost of the Landmark education, the classification officer found that "Landmark's program has not, however, proven to be best." We find no support in the regulatory scheme for the

requirement that the private school selected by the parents be the "best." It is sufficient that the school provided an adequate education.

The classification officer continued his criticism of the Landmark program by stating, "[f]urther, it is much more unnecessarily restrictive than respondent's [the board's] program. * * * [N]o demonstration is made to indicate that [John] requires a residential placement in order to benefit from an educational program." Similarly, the trial court concluded that John could have remained a day student at Ramapo if the district had furnished the level of education provided by Landmark. Thus, the trial court implicitly found that residence in a private school was not necessary. After implicitly weighing the equities of the case, the court ordered reimbursement for the cost of John's tuition, but not his room and board.

Our review of the record satisfies us that the trial court's decision is supported by substantial credible evidence. See *Rova Farms Resort v. Investors Ins. Co.*, 65 *N.J.* 474, 484 (1974). Depending on the facts, parents in another case in which the district fails to provide an appropriate education might be entitled to reimbursement for room and board as well as for tuition. Here, however, we believe the equities tip in favor of requiring Ramapo to reimburse the Lascaris for the cost of John's tuition at Landmark. In reaching this result, we have sought to fulfill the promise of the federal and State schemes for the education of handicapped children and to avoid placing an undue burden on either the local school district or the parents of a handicapped child.

We close with the following thought. Under EAHCA, the right to a due-process hearing is the recognized remedy when a board fails to furnish a handicapped child with a free, appropriate education. In future cases, a board might reduce the need for that remedy by increased communication with the child's parents. *Cf.* J. Handler, *The Conditions of Discretion: Autonomy, Community, Bureaucracy* 92–119 (1986). We make

this observation not to criticize the Ramapo school officials, but with the hope that it might prevent future cases from becoming quite so protracted.

The judgment of the Appellate Division is reversed, and the matter is remanded to the Chancery Division for the entry of a judgment consistent with this opinion.

*For affirmance and remandment* —Chief Justice WILENTZ, and Justices CLIFFORD, HANDLER, POLLOCK, O'HERN, GARIBALDI and STEIN—7.

*Opposed* —None.