**Rafael OBERTI, by his parents and next friends Carlos and Jeanne OBERTI, et al., Plaintiffs,**

v.

**BOARD OF EDUCATION OF the BOROUGH OF CLEMENTON SCHOOL DISTRICT, et al., Defendants.**

**Civ. A. No. 91–2818.**

United States District Court, D. New Jersey.

April 24, 1992.

---

Frank Laski, Penelope A. Boyd, Philadelphia, Pa., for plaintiffs.

Thomas J. Murphy, Marlton, N.J., for defendants.

## OPINION

GERRY, Chief Judge.

Rafael Oberti is a seven year old boy. He has a disability that distinguishes him, in some ways, from other seven year olds. This lawsuit revolves around the obligation of his home school district in the Borough of Clementon, New Jersey, to provide for his education. Rafael's parents contend that Clementon's plan to educate Rafael in a segregated special education class outside of the school district instead of in a regular school class in Rafael's neighborhood school was adopted in violation of the Individuals with Disabilities Education Act, 20 U.S.C. §§ 1400–85 (the "IDEA"), and section 504 of the Rehabilitation Act, 29 U.S.C. § 794.

The case is before the court following a state administrative ruling in favor of the defendant Board of Education of the Borough of Clementon School District (the "School District"). Currently before us are cross-motions for summary judgment. Additionally, plaintiffs have moved to strike the affidavit of one of defendants' experts, or, in the alternative, for leave to file a counter affidavit. As discussed below, we will deny both motions for summary judgment; deny plaintiffs' motion to strike; and grant plaintiffs leave to file their counter affidavit. Finally, we will set this matter down for a plenary hearing on an expedited basis.

## I. *Background*

Rafael Oberti was born with Downs Syndrome, a genetic defect, and as a result he has a developmental disability including mental retardation. He also has a communication impairment: he has difficulty with expressive language.

Rafael's parents are committed "to assure his free and appropriate education in the least restrictive environment.... [T]hey have left no stone unturned in seeking to have their child educated in a fashion which will prepare him for inclusion as an adult in the community at large. They are unquestionably determined ... [for him to] be able to cope within a population which will naturally include the broad spectrum of human potential." Decision of Administrative Law Judge Lavery, March 8, 1991, at 15 (hereinafter "ALJ Decision").

Rafael attended preschool special education classes until he reached kindergarten age. During the summer before he would have entered kindergarten, the

School District's Child Study Team[1] evaluated him and recommended to his parents that he attend a segregated, self-contained special education class located in another school district. Rafael's parents visited a number of classes recommended by the district and found them unacceptable. Thereafter the parents and School District agreed that Rafael would attend the Clementon Elementary School developmental kindergarten, a class for kindergartners not fully ready for regular kindergarten, for half the day, and a special education class in another school district for the other half of the day.[2]

At the end of the school year, the Child Study Team again proposed an out-of-district placement, this time in a segregated special education class for students classified as "educable mentally retarded." Rafael's parents objected to this and requested that he be placed in the Clementon Elementary School regular kindergarten. The School District rejected this request, and Rafael's parents instituted state administrative proceedings challenging the District's recommendation. *See* N.J.A.C. 6:28–2.7.

Prior to the administrative hearing, the School District and Rafael's parents submitted their dispute to mediation. As a result, an agreement was reached whereby Rafael would attend a class for students classified as "multiply handicapped" at the Winslow Township School District. In December of 1990, however, Rafael's parents requested an administrative hearing because of their dissatisfaction with the Winslow placement. On February 4 and 5, 1991, a hearing was held before the Hon. Joseph Lavery, Administrative Law Judge,

New Jersey Office of Administrative Law. On March 15, 1991, Judge Lavery affirmed the School District's decision that the appropriate and least restrictive placement for Rafael, closest to home, was within a segregated special education class located outside the school district. Rafael's parents filed this lawsuit challenging this placement decision. *See* 20 U.S.C. § 1415(e).

## II. *The Individuals with Disabilities Education Act ("IDEA")*

This landmark legislation, enacted in 1975, represents a clear congressional commitment to end a period of our history characterized by the segregation and abandonment of children with disabilities.[3] The statute requires states receiving federal assistance to share that commitment by developing ways of including children with disabilities within the mainstream of the educational programs in their communities.[4]

The IDEA and its implementing regulations set forth various substantive and procedural requirements designed to "assure that all handicapped children have available to them ... a free appropriate public education which emphasizes special education and related services designed to meet their unique needs, [and] to assure that the rights of handicapped children and their parents or guardians are protected...." 20 U.S.C. § 1400(c). The centerpiece of these requirements is the Individualized Education Program ("IEP"), in which the school district must identify the program it develops for meeting the unique needs of every child with a disability.[5] *See Honig v.*

1. The Child Study Team consists of school personnel responsible for evaluating and coordinating special education services and for recommending special education placements.

2. State law required the School District to provide Rafael with a full day of school. The developmental kindergarten met only for half the day.

3. Congress passed the original Act in part in response to its finding that children with disabilities were too often excluded from the public school system or "warehoused" in special classes and neglected. *See* 20 U.S.C. § 1400(b);

H.R.Rep. No. 94–332, 94th Cong., 1st Sess. 2 (1975) U.S.Code Cong. & Admin.News 1975, pp. 1425, 1426.

4. New Jersey is a participating state under the Act. *See Lascari v. Board of Education of the Ramapo Indian Hills Regional High School District,* 116 N.J. 30, 34, 560 A.2d 1180, 1182 (1989).

5. As described by the Eleventh Circuit:

The IEP is developed at a meeting among qualified officials, the child's teacher, the child's parents or guardians, and, when appropriate, the child. It must include, among oth-

*Doe,* 484 U.S. 305, 311–12, 108 S.Ct. 592, 597–98, 98 L.Ed.2d 686 (1988).

The IDEA also establishes a preference for mainstreaming. The Act states that schools must establish procedures:

> to assure that, to the maximum extent appropriate, handicapped children, including children in public or private institutions or other care facilities, are educated with children who are not handicapped, and that special classes, separate schooling, or other removal of handicapped children from the regular educational environment occurs only when the nature or severity of the handicap is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily.[6]

20 U.S.C. § 1412(5)(B). Thus, "Congress created a statutory preference for educating handicapped children with nonhandicapped children." *Greer by Greer v. Rome City School District,* 950 F.2d 688, 695 (11th Cir.1991), *opinion withdrawn on other grounds,* 956 F.2d 1025 (11th Cir. 1992). *See also Board of Education, Sacramento City Unified School District v. Holland,* 786 F.Supp. 874, 877–78, (E.D.Cal.1992) (the Act's preference for mainstreaming "rises to the level of a rebuttable presumption"). The IDEA thereby commands that "[t]o the maximum extent appropriate" children with disabilities be included in regular classroom settings, as close to home as possible.[7] *See* 34 C.F.R. § 300.552(a)(3); N.J.A.C. 6:28–2.10(a)(3) and (5).

█ The IDEA imposes affirmative obligations on school districts to consider placing children with disabilities in regular classroom settings, "with the use of supplementary aids and services," *before* exploring other alternatives.[8] *See Greer,* 950 F.2d at 696 ("before the school district may conclude that a handicapped child should be educated outside the regular classroom, it must consider whether supplemental aids and services would permit satisfactory edu-

---

er things, statements of the child's present level of educational performance, annual goals for the child, the specific educational services to be provided the child, and the extent to which the child will be able to participate in regular education programs. School officials must convene a meeting at least annually to review and, when appropriate, revise the IEP. As this court has recognized, 'the IEP is more than a mere exercise in public relations. It forms the basis for a handicapped child's entitlement to an individualized and appropriate education.' Thus, the importance of the development of the IEP to meet the individualized needs of the handicapped child cannot be underestimated. *Greer by Greer v. Rome City School District,* 950 F.2d 688, 694–95 (11th Cir.1991) (*quoting Doe v. Alabama State Department of Education,* 915 F.2d 651, 654 (11th Cir.1990)), *opinion withdrawn on other grounds,* 956 F.2d 1025 (11th Cir.1992). *See also* 20 U.S.C. §§ 1401(a)(19); 34 C.F.R. §§ 300.343–46; N.J.A.C. § 6:28–1 *et seq.*

6. The IDEA requires participating school districts to provide "a continuum of alternate placements ... available to meet the needs of" children with disabilities. 34 C.F.R. § 300.551. Accordingly, there must be available, at one end of the continuum, completely segregated placements within separate schools, and, at the other end, placements within regular classes in public schools.

When a child with a disability is placed as a full member of a regular class, with the provi-

sion of "supplementary aids and services," this is known as supported inclusive education ("inclusion"). The middle of the continuum contains mixed placements in which a child might be a member of a regular class but obtain certain supplementary services in a separate "resource room," or where he or she might be a member of a self-contained special education class, but spend portions of time "mainstreamed" in regular classes or along with nondisabled students in other school activities such as recreation or lunch. *See Daniel R.R. v. State Board of Education,* 874 F.2d 1036, 1050 (5th Cir.1989).

7. We are impressed by the common sense of this preference for inclusion. *Brown v. Board of Education,* 347 U.S. 483, 493, 495, 74 S.Ct. 686, 692, 98 L.Ed. 873 (1954), highlighted the importance of education and the inequality inherent in any segregated educational system. The point of the IDEA is to bring children with disabilities back into the community to which they belong. The fact that this approach benefits every member of the community, not simply children with disabilities, is often overlooked. The goal of this type of integration is not only for people with disabilities to learn to live and function in the community, but also for those community members without disabilities to learn to live and function along with them.

8. We note that a full evaluation of each child must occur prior to any placement decision. *See* 34 C.F.R. §§ 300.531 & 300.532.

cation in the regular classroom"); *Daniel R.R. v. State Board of Education,* 874 F.2d 1036, 1048 (5th Cir.1989) ("First we ask whether education in the regular classroom with the use of supplementary aids and services, can be achieved satisfactorily"). Accordingly, the Act incorporates a "least restrictive environment" requirement.[9] 34 C.F.R. § 300.552; N.J.A.C. 6:28–2.10. Although the substance of such considerations must be left to the expertise, discretion, and creativity of local school officials, *see Daniel R.R.,* 874 F.2d at 1046, school districts carry the burden of justifying challenged placements. *See Lascari v. Board of Education of the Ramapo Indian Hills Regional High School District,* 116 N.J. 30, 44, 560 A.2d 1180, 1188 (1989).

■ School districts therefore must carefully examine the educational benefits, both academic and nonacademic, available to a child with a disability in a regular classroom. Among the factors to be considered are the advantages derived from modeling the behavior and language of children without disabilities;[10] the effects of such inclusion upon the other children in the class, both positive and negative; and the cost of necessary supplementary services. *See Greer,* 950 F.2d at 697; *Barnett v. Fairfax County School Board,* 927 F.2d 146, 153–54 (4th Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 175, 116 L.Ed.2d 138 (1991); *Daniel R.R.,* 874 F.2d at 1048–50. However, the preference or presumption in favor of inclusion will not be rebutted unless the school district shows either that the child's disabilities are so severe that he or she will receive little or no benefit from inclusion;[11] that he or she is "so disruptive as to significantly impair the education of other children" in the class;[12] or that the cost of providing an inclusive education "will significantly affect other children in the district." *Holland,* 786 F.Supp. at 874.

■ Neither the Supreme Court nor the Third Circuit has yet considered the mainstreaming requirements of the IDEA. We agree with the Sixth Circuit, which, in *Roncker v. Walter,* 700 F.2d 1058 (6th Cir.), *cert. denied,* 464 U.S. 864, 104 S.Ct. 196, 78 L.Ed.2d 171 (1983), stated:

The perception that a segregated institution is academically superior for a handi-

---

9. This requirement is met when a child with a disability becomes a full member of a regular class or when a child who cannot be fully included is mainstreamed to the "maximum extent appropriate." In this way, the IDEA seeks to overcome the segregation and stigmatization of children with disabilities.

10. *See Daniel R.R.,* 874 F.2d at 1049 ("[T]he language and behavior models available from nonhandicapped children may be essential or helpful to the handicapped child's development. In other words, although a handicapped child may not be able to absorb all of the regular education curriculum, he may benefit from nonacademic experiences in the regular education environment").

11. The presumption is not rebutted by a showing that a segregated special education placement may be academically superior to inclusion in a regular class with supplementary aids and services. *See Roland M. v. Concord School Comm.,* 910 F.2d 983, 993 (1st Cir.1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 1122, 113 L.Ed.2d 230 (1991); *Roncker v. Walter,* 700 F.2d 1058, 1063 (6th Cir.), *cert. denied,* 464 U.S. 864, 104 S.Ct. 196, 78 L.Ed.2d 171 (1983); *Holland,* 786 F.Supp. at 878–79. If a child with a disability can receive a "satisfactory education" in a regular education classroom, even if it is not the best or ideal academic setting for that child, the requirements of the IDEA are satisfied, and a segregated placement is inappropriate. *Id.*

In *Daniel R.R.,* 874 F.2d at 1050, the court upheld a school district's position that it could not provide a satisfactory education in a regular setting to a six year old boy who, as a result of Downs Syndrome, was mentally retarded and had a communication impairment, when such inclusion would require the curriculum to be modified "beyond recognition." We note, however, in agreement with the *Holland* court, that curriculum modification is contemplated by the IDEA, and that it may become a factor justifying exclusion only when it bears upon other legitimate factors that may be considered, such as the possible negative effects upon the other students in the class of including a particular child with a disability within the class. *See Holland,* 786 F.Supp. at 879–80.

12. This type of disruption occurs when, despite the assistance of supplementary aids and services, and "after taking all reasonable steps to reduce the burden to the teacher, the other children in the class will still be deprived of their share of the teacher's attention." *Holland,* 786 F.Supp. at 879. The education of the other children must be "significantly impaired" by the inclusion of the child with a disability to justify exclusion on this basis. *Id.*

capped child may reflect no more than a basic disagreement with the mainstreaming concept. Such a disagreement is not, of course, any basis for not following the Act's mandate. In a case where the segregated facility is considered superior, the court should determine whether the services which make the placement superior could be feasibly provided in a nonsegregated setting. If they can, the placement in the segregated school would be inappropriate under the Act. *Id.* at 1063 (citation omitted).

Thus, in collaboration with the family, a school district must make a threshold determination as to what special services a child with a disability needs and must then determine whether those needs can be met within the matrix of a regular classroom setting with the provision of supplementary aids and services. As noted by the Eleventh Circuit:

> [B]efore the school district may conclude that a handicapped child should be educated outside the regular classroom, it must consider whether supplemental aids and services would permit satisfactory education in the regular classroom. The school district must consider the whole range of supplemental aids and services, including resource rooms and itinerant instruction, for which it is obligated under the Act and the regulations promulgated thereunder to make provision. Only when the handicapped child's education may not be achieved satisfactorily, even with one or more of these supplemental aids and services, may the school board consider placing the child outside of the regular classroom.

*Greer*, 950 F.2d at 696.

Courts that oppose such an interpretation of the Act have held that the *Roncker* test "necessitates too intrusive an inquiry into the educational/policy choices that Congress deliberately left to state and local school officials." *Daniel R.R.*, 874 F.2d at 1046. We see no other way, however, to enforce the IDEA's mainstreaming requirements. Moreover, although we agree with the *Daniel R.R.* court that "States need not provide every conceivable supplementary aid or service to assist the child," *id.* at 1048, we believe that the IDEA obligates school systems to provide a certain level of supplementary aids and services which will vary in every case. In each case, however, there will be a floor beneath which such provisions will be deemed inadequate. *Id.* ("the Act does not permit states to make mere token gestures to accommodate handicapped students").

Thus, "Congress plainly required schools to hire various specially trained personnel to help handicapped children...." *Irving Independent School District v. Tatro*, 468 U.S. 883, 893, 104 S.Ct. 3371, 3377, 82 L.Ed.2d 664 (1984). This includes the services of physical, occupational, and speech therapists. *See Polk v. Central Susquehanna Intermediate Unit 16*, 853 F.2d 171, 176 (3d Cir.1988), *cert. denied sub nom. Central Columbia School District v. Polk*, 488 U.S. 1030, 109 S.Ct. 838, 102 L.Ed.2d 970 (1989); 20 U.S.C. § 1401(a)(16). Additionally, a school district must assign a supplementary teacher's aide to a regular classroom, on a full or part-time basis, if necessary, to accommodate the special needs of included children with disabilities. *See, e.g., Department of Education, State of Hawaii v. Katherine D.*, 727 F.2d 809, 813 (9th Cir.1983) (aide ordered for child with cystic fibrosis), *cert. denied*, 471 U.S. 1117, 105 S.Ct. 2360, 86 L.Ed.2d 260 (1985). In other words, the IDEA requires school districts to supplement their resources in order to meet the special needs of children with disabilities.

In order to accomplish the IDEA's goals, schools must maximize mainstreaming opportunities. Thus, a school district must coordinate special services delivery to a child with a disability placed in a regular classroom setting. Moreover, teachers, aides, and other school personnel involved on the front lines will require varying degrees of support and training, depending upon the particular special needs involved. *See, e.g., Polk*, 853 F.2d at 173–74. All of this, of course, requires a substantial degree of consultation and communication between the special service forces of a school district, supplemented by consultation and assistance from outside sources if neces-

sary, and teachers and other front line school personnel.

In sum, the IDEA sets forth its preference for mainstreaming in terms of least restrictive environments. Participating school systems must provide a continuum of placements, ranging from full inclusion in regular settings, in which a child with a disability becomes a full member of the regular class, to completely segregated settings, *see* 34 C.F.R. § 300.551(a) and (b), and must consider the least restrictive option first. Moreover, children placed in segregated or partially segregated settings must be simultaneously included in mainstream components "to the maximum extent appropriate." Finally, in accordance with the purposes and policies expressed by Congress in the IDEA, the goal for every child should be directed toward moving up on the continuum in the direction of full inclusion.

The IDEA incorporates a vision of our educational system in which, whenever possible, children with disabilities become fully integrated members of the educational community. The goal of the IDEA is realized when a child with a disability can become included, accepted, and respected as a full member of a regular class, and is no longer seen as an outsider.

### III. *Discussion*

#### A. Standards of Review

■ The IDEA provides that the court "shall receive the records of the administrative proceedings, shall hear additional evidence at the request of a party, and, basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(e)(2). Although the Supreme Court has not reached the Act's mainstreaming requirements, it has defined the standard of review in other IDEA cases as follows:

First, has the State complied with the procedures set forth in the Act? And second, is the individualized educational program developed through the Act's procedures reasonably calculated to enable the child to receive educational bene-

fits? If these requirements are met, the State has complied with the obligations imposed by Congress and the courts can require no more.

*Board of Education v. Rowley*, 458 U.S. 176, 206–207, 102 S.Ct. 3034, 3051, 73 L.Ed.2d 690 (1982).

Although the Court has cautioned that courts may not "substitute their own notions of sound educational policy for those of the school authorities which they review," *id.* at 206, 102 S.Ct. at 3051, in mainstreaming cases we must determine whether the State has complied with the mainstreaming requirements set forth in the Act. *See Polk*, 853 F.2d at 184 ("we do not read the Supreme Court's salutary warnings against interference with educational methodology as an invitation to abdicate our obligation to enforce the statutory provisions that ensure a free and appropriate education" to children with disabilities).

Moreover, we note that a school district carries the burden of proof "not only when it seeks to change the IEP, but also when the parents seek the change." *Lascari v. Board of Education of the Ramapo Indian Hills Regional High School District*, 116 N.J. 30, 44, 560 A.2d 1180, 1188 (1989). Thus, when challenged, a school district must show that its placement decisions satisfy the procedural and mainstreaming requirements of the IDEA.

With respect to the motions currently before us, we may grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). A genuine dispute will be found "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). *See also Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986) (nonmovant must show more

than "some metaphysical doubt as to material facts"). To prevail on summary judgment the evidence must be "so one-sided that one party must prevail as a matter of law." *Anderson*, 106 S.Ct. at 2512. In making this judgment, we view the facts in the light most favorable to the nonmoving party, without weighing evidence or making credibility determinations. *See id.* at 2511.

However, we "must view the evidence through the prism of the substantive evidentiary burden." *Id.* at 2513. Accordingly, a party moving for summary judgment and not bearing the burden of proof at trial need not negate the other party's case. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). Rather, the moving party could discharge its burden by demonstrating the absence of an essential element of the case of the opponent, who bears the burden of proof at trial. *See id.*

In the matter *sub judice*, the issue is whether the School District complied with the procedures and mainstreaming requirements of the IDEA by deciding to place Rafael in a segregated special education class in another town, without any contemporaneous mainstreaming. We must determine whether the School District gave adequate consideration to placing Rafael in a regular class with supplementary aids and services, and whether his current program and segregated placement, embodied in his IEP, which does not include mainstreaming, represents the least restrictive program and placement for him at this time. Ultimately, the School District must convince the court that Rafael cannot be educated within the matrix of a regular class in his neighborhood school with supplementary aids and services and in fact is unready for any degree of mainstreaming.

### B. Rafael's Educational Experiences

We turn to examine whether, with respect to the education of Rafael Oberti, the Clementon School District has fulfilled its obligations under the IDEA. Although technically we have only been asked to review the School District's current plan for Rafael, which was formulated for the 1990–1991 school year, we begin with the 1989–1990 school year, when Rafael entered the developmental kindergarten, because subsequent placement decisions were based, in large part, upon Rafael's experience that year.

### 1. *The 1989–1990 School Year*

■ It appears that the School District's first action with respect to Rafael occurred when he was to have entered kindergarten. At that time, after meeting with Rafael's parents and evaluating Rafael, the District recommended an out-of-district placement in a self-contained classroom. Rafael's parents objected to this recommendation, and then the District agreed to place Rafael half-time in the developmental kindergarten, and half-time in an out-of-district special education class. There is no evidence in the record indicating that the School District independently considered a less restrictive placement for Rafael before making the initial decision to place him in a segregated setting.[13] This violated the requirements of the IDEA.

The IEP prepared for Rafael for that year[14] indicates that the School District planned for the developmental kindergarten primarily to provide "modeling & social imitation."[15] It was contemplated that the

---

**13.** For instance, there is no indication that either in meeting with Rafael's parents or in evaluating Rafael, less restrictive placements were considered. Additionally, we note that the following year, the School District clearly documented its consideration of alternate placements for Rafael.

**14.** The actual IEP was not introduced as an exhibit at the administrative hearing and was not otherwise included in the record. A copy of the IEP was finally submitted to us by counsel for the School District after oral argument. We consider it as part of the record because the IDEA makes provisions for courts to receive additional evidence after the conclusion of administrative proceedings. *See* 20 U.S.C. § 1415(e)(2).

**15.** The IEP stated that "Rafael will participate within the kindergarten readiness programs in order to provide oral stimulation, appropriate age peer example and benefit from incidental learning within the kindergarten class."

special education class would implement all other IEP goals and objectives, and such goals were specified in the IEP.[16] Nevertheless, the IEP indicated that various supplementary aids and services were to be provided for Rafael in the developmental kindergarten, including physical therapy, speech therapy, and occupational therapy consultation. Additionally, the IEP contemplated "modification of regular class expectations to reflect developmental level." Although in its "Current Educational Status" section the IEP indicated that Rafael had behavior problems and needed help with toileting, the IEP did not spell out a plan for managing these problems.

At oral argument, when asked what supplementary aids and services were provided to Rafael in the developmental kindergarten, counsel for the School District represented that the teacher, Mrs. Reardon, had prior experience working with children with special needs; that she worked closely with the Child Study Team; that she had frequent consultations with the other kindergarten teacher, who had experience working with children with Downs Syndrome; that behavioral control techniques were implemented; that the curriculum of the class was restructured downward to accommodate Rafael; and that a second aide was added to the class.

However, the developmental kindergarten teacher, who testified at the administrative hearing and in deposition, stated that although she had some experience working with children with special needs, she had never taught a child with mental retardation. The ALJ found that the other kindergarten teacher in the school, who was "experienced with Down's Syndrome children," provided occasional assistance to Rafael's teacher, and that the school psychologist "intermittently" provided assistance. With respect to the addition of the aide, it is undisputed that in the beginning of December of the school year Rafael's parents requested that a teacher's assistant or aide be added to the class to assist Rafael. However, it was not until March that an such an aide was hired.

The parties have painted remarkably different pictures of Rafael's experience in the developmental kindergarten. The Obertis primarily document the progress Rafael made during the year, although acknowledging, to a degree, various behavior problems Rafael manifested there.[17] The School District, on the other hand, primarily documents Rafael's behavioral and communication problems.[18] According to the School District, the class was way over Rafael's head; and although Mrs. Reardon testified that he was able to follow perhaps up to 25% of the curriculum, the School District argued that Rafael gained nothing from the experience and substantially disrupted the functioning of the rest of the class.

If, indeed, as the School District contends, Rafael presented behavior problems in class which were severe and extremely disruptive to the entire class, the School District's remedial responses to these problems appear to have been woefully inade-

---

**16.** These included, among other things, fine and gross motor skills, academic skills, and self-help skills.

**17.** In support thereof, progress reports were introduced in which Mrs. Reardon opined that there was social and emotional improvement, better class participation, improved communication ability and language development, and some academic mastery during the school year.

**18.** The School District portrayed Rafael as an aggressive, primitive, resistant child. Numerous incidents of Rafael's disruptive outbursts, temper tantrums, and short attention span were catalogued.

There is a factual dispute between the parties as to whether Rafael represented a danger to other children. There is also a factual dispute as to whether Rafael "inappropriately" touched other children.

The School District was obviously extremely concerned about Rafael's difficulties with toileting skills, and used these difficulties to highlight Rafael's unreadiness for an inclusive program. There is no question, however, that working on such skills becomes part and parcel of the education of the student. *See Battle v. Pennsylvania*, 629 F.2d 269, 275 (3d Cir.1980), *cert. denied sub nom., Scanlon v. Battle*, 452 U.S. 968, 101 S.Ct. 3123, 69 L.Ed.2d 981 (1981) ("[w]here basic self-help and social skills such as toilet training … and communication are lacking, formal education begins at that point").

quate. It is uncontested that Rafael's IEP failed to spell out a program for managing or attempting to manage the behavioral difficulties the School District documented. If Rafael was as difficult as defendants claim he was, provision of a personal aide in March (instigated by a request from the parents), without any definite plan with respect to her functions, and irregular, *ad hoc,* assistance from another teacher and the school psychologist, were wholly insufficient efforts to meet Rafael's special needs.

The testimony of Mrs. Reardon unequivocally confirms this. Although obviously a concerned and conscientious teacher, she was overwhelmed by Rafael's needs and did not receive sufficient formal support from the School District and Child Study Team or from outside consultants. No structured special education consultation was provided to her. Nor was there any formal coordination between the special and regular education components of Rafael's program. Mrs. Reardon had no contact with Rafael's special education teacher; and Ms. McDevit, who was the school psychologist and coordinator of special education services, as well as the head of the Child Study Team in charge of Rafael's IEP, only visited the special education class three times during the entire year. Mrs. Reardon had only informal contact with Rafael's speech therapist, despite the fact that she testified that Rafael's communication problems were of central concern with respect to his functioning in the classroom.

In large part, the resources of the District were mobilized to respond to Rafael's disruptive behavior in class, and even this was operationalized only on an informal basis. In other words, most intervention was reactive. Ms. McDevit conceded that there was no written plan in place designed prospectively to deal with Rafael's behavior or, for that matter, with any aspect of his educational needs within the developmental kindergarten. Although she testified that the Child Study Team was in constant touch with Mrs. Reardon, there is no evidence in the record which suggests that this communication was in any way adequate to create an individualized educational or management plan.

Essentially, Mrs. Reardon and Rafael were left to their own devices, and both conceded that they were inadequate for the task—Mrs. Reardon by her express testimony, and Rafael by his behavior. In fact, Mrs. Reardon testified at the administrative hearing that her efforts to modify the curriculum to meet Rafael's special needs were unsuccessful, and that much of Rafael's disruptive behavior appeared to be related to his frustration at being left behind with respect to the curriculum speed of the rest of the class. She later testified that her expectations for Rafael were limited to what he might gain from modeling the other children in the class. This reflects the School District's failure to develop a comprehensive individualized program for Rafael.

On the one hand, the School District was relying upon the afternoon special education class to meet most of Rafael's needs, including all of his academic needs. On the other hand, recognizing that Rafael could only follow at most 25% of the regular curriculum in the developmental kindergarten, Mrs. Reardon on her own was attempting to modify the curriculum for Rafael. Her efforts failed, however, due to the lack of systemic support, and Rafael was left adrift. It is no wonder, therefore, that all of the School District's witnesses, including its expert, opined that Rafael's difficulties, specifically his behavior problems, were the result of his inability to keep up with the regular curriculum.

The IDEA requires school districts to develop comprehensive individualized plans, reflected and memorialized in IEP's, for dealing with the problems presented by children with special needs. *See* 20 U.S.C. § 1401(a)(19)(C) (IEP must include "a statement of the specific educational services to be provided"). As noted by the *Daniel R.R.* court: "If the state is providing supplementary aids and services and is modifying its regular education program, we must examine whether its efforts are sufficient. *The Act does not permit states to make mere token gestures to accommodate*

*handicapped students;* its requirement for modifying and supplementing regular education is broad." 874 F.2d at 1048 (emphasis supplied). *See also Holland,* 786 F.Supp. at 879 ("The IDEA, in its provision for the IEP process, contemplates that the academic curriculum may be modified to accommodate the individual needs of handicapped children").

There would be no need for a federal law such as the IDEA if the resources in place in all participating school systems were adequate to educate children with disabilities "to the maximum extent appropriate ... with children who are not handicapped." Thus, the IDEA requires school systems to supplement and realign their resources to move beyond those systems, structures, and practices which tend to result in unnecessary segregation of children with disabilities. We find nothing in the record to indicate that the School District satisfied these affirmative obligations with respect to Rafael's experience in the developmental kindergarten.[19]

Mrs. Reardon's testimony suggests that the School District failed to support Rafael's inclusion from the very beginning and thus designed a trial experience for Rafael in the developmental kindergarten which might have been expected to fail, and which, indeed, at least in part, fulfilled such an expectation. In fact, the modicum of Rafael's progress during the year impresses upon us the progress he might have made had an appropriate program been provided from the beginning.

We have not been called upon directly to review the adequacy of the IEP which was in place for the developmental kindergarten year. There is no question, however, that the School District violated the procedural requirements of the IDEA initially by not considering less restrictive placements for Rafael. Moreover, we do not believe that the School District has raised a genuine issue of material fact with respect to whether it provided an adequate level of supplementary aids and services to Rafael in the developmental kindergarten. There is no dispute about the services that actually were provided; and although determining the adequacy of those services ordinarily would require expert testimony, we do not believe that this is necessary here where the services provided were so clearly inadequate. Accordingly, it was unfair and improper for the School District to base subsequent placement decisions upon Rafael's behavior problems, or upon his progress *vel non,* during the developmental kindergarten year.

### 2. *The 1990–1991 School Year*

 At the end of the 1989–1990 school year, the School District informed Rafael's parents that it had considered various alternatives, including inclusive placements, and concluded that Rafael needed to be in an out-of-district segregated class for children classified as "educable mentally retarded."[20] The ALJ found that "[t]his was because of shortcomings in academic development offerings, and because of behavioral concerns among the staff, attributed to

---

**19.** This is not to suggest that an inclusive IEP cannot provide for specific educational components to be provided outside of the regular classroom in a resource room, or, as in this case, in a special afternoon program. However, this does not relieve the school from the obligation contemplated by the IDEA to coordinate the special and regular education components of the child's program and to put in place a comprehensive program for implementation in the regular class. Landing a child with special needs in a regular education class, if only for socialization and modeling—and based upon Mrs. Reardon's testimony, the School District obviously did not so limit its goals for Rafael in the developmental kindergarten—requires considerably more input and planning than that allocated by the School District in this case.

**20.** The School District informed Rafael's parents that it had considered the following:

  1. A developmental kindergarten with a special support teacher in the morning, with regular kindergarten in the afternoon, plus speech, physical therapy and occupational therapy (lunch at home).
  2. Regular kindergarten with a special education support teacher in the morning with Resource room and three therapies in the afternoon.
  3. Perceptually impaired classroom and kindergarten with the three therapies.
  4. Perceptually impaired classroom plus resource room plus therapy.

*See* Decision of the ALJ at 3–4.

the child's performance during the [prior] school year in Clementon." ALJ Decision at 4.

After mediation, the School District and Rafael's parents agreed that Rafael would attend a class for children classified as multiply handicapped at the Winslow Township School District. Rafael's parents agreed to this placement on the condition that there would be significant "mainstreaming" at Winslow, and that Rafael would be returned to Clementon Elementary School as soon as possible.[21] When it became apparent to them that these conditions were not being fulfilled at Winslow, where Rafael remained almost completely segregated, Rafael's parents requested a due process hearing, and the process leading to this lawsuit began.

Again, the parties have presented contrasting and self-serving characterizations of Rafael's experience at Winslow. In support of the proposition that a segregated special education class represents the most appropriate placement for Rafael, the School District paints a picture of eventual progress at Winslow and emphasizes that the services provided there, particularly the special education components, absolutely could not be provided to Rafael in a regular education setting. In support of the proposition that an inclusive placement is most appropriate, the Obertis suggest that Rafael deteriorated while at Winslow due to the segregated nature of the placement.[22]

The testimony of Rafael's teacher at Winslow indicated that his overall difficulties continued for the first half of the year at Winslow and improved thereafter. Difficulties with respect to Rafael's toileting skills were managed by implementing a behavior modification program. Otherwise, an "integrated," multi-sensory approach was adopted, in which the teacher worked closely with the speech, occupational, and physical therapists.

We note that the parties do not dispute the appropriateness of this educational approach. Their dispute centers upon whether this approach could be replicated in a less restrictive setting. The School District, as well as the Winslow staff, argue that Rafael is unready for even minimal mainstreaming at this time.

Irrespective of the dispute about the success of the Winslow placement, however, we believe that the School District's decision to place Rafael in a segregated, self-contained setting for the 1990–1991 school year was flawed because it was substantially based upon Rafael's performance in the developmental kindergarten. Having failed adequately to address Rafael's behavioral problems in the developmental kindergarten, it was improper to justify a segregated placement based upon those problems. Accordingly, this placement decision must be reversed, and the court must determine the proper placement for Rafael at this time. We thus turn to the experts.

### C. Battle of the Experts[23]

■ We have been presented with conflicting expert reports with respect to the

---

**21.** The agreement between the School District and the Obertis provided, in part, that possibilities for mainstreaming at Winslow would be evaluated in six weeks and that the School District would continue to explore appropriate programs for Rafael.

**22.** For instance, Rafael's parents testified that there were increased incidents of toileting accidents at Winslow; that Rafael had begun wetting his bed at night; and that he was reluctant to board the school bus (for the daily 45 minute ride to Winslow). Rafael's mother attributed such regression to his feelings about being in a segregated program.

**23.** On February 25, 1992, in support of their motion for summary judgment, the School District filed with the court the affidavit of Stanley J. Urban, Ph.D. On March 27, 1992, plaintiffs moved to strike this affidavit because it was filed in violation of Magistrate Judge Simandle's January 8, 1992 Amended Scheduling Order or, in the alternative, to permit them to file the counter affidavit of Lou Brown, Ph.D.

We note that there has been some confusion concerning deadlines in this matter. Because the IDEA makes provisions for courts to receive additional evidence after the conclusion of administrative proceedings, *see* 20 U.S.C. § 1415(e)(2), and because we believe that plaintiffs' counter affidavit substantially reduces any prejudice to them, we choose to consider both affidavits. *See* Fed.R.Civ.P. 56(e) ("The court may permit affidavits to be supplemented or opposed by depositions, answers to interrogatories, or further affidavits").

degree to which Rafael can be included in a regular education program with supplementary aids and services, and particularly whether the arguably successful methods and strategies adopted in the Winslow special education class could be employed within a regular education class at Clementon. These present a genuine issue of disputed, material fact.

The school personnel involved with Rafael both at Clementon and at Winslow uniformly testified that Rafael was ready only for placement in a segregated special education class such as the Winslow class for students classified as multihandicapped. Clementon's coordinator of special services, Ms. McDevit, testified that the "multi-sensory" approach employed at Winslow directed toward Rafael's cognitive development could not be replicated at Clementon in a regular class.

Dr. Stanley J. Urban, a professor of special education at Glassboro State College, who reviewed all of the files relevant to Rafael's education, and observed and interviewed Rafael for the School District, concluded that, in light of Rafael's "extraordinary and continual behavioral problems," as well as his "immaturity," he is "an unsuitable candidate for placement in a regular class." Based upon the premise that Rafael's behavior was more appropriate in his special placements than it was in the developmental kindergarten, Dr. Urban opined that Rafael's "aberrant behavior" was induced by the frustration of being in a normalized environment which "isolated him and emphasized his differences."

In Dr. Urban's opinion, special training of a regular classroom teacher and aide could not bridge the gap necessary to reach Rafael, a task that could only be accomplished by a trained special education teacher. Any attempt to meet Rafael's needs in a regular setting, according to Dr.

Urban, would be so labor-intensive that the other children in the class would be deprived. Moreover, Dr. Urban believed that it would be educationally untenable to attempt to fashion a separate curriculum for Rafael and to implement it within a regular classroom side by side with the regular curriculum.

On the other hand, Dr. Gail McGregor, an assistant professor of teacher education at Temple University, and Dr. Lou Brown, a professor of special education at the University of Wisconsin, who reviewed all of the files relevant to Rafael's education, and observed and interviewed Rafael for the Obertis, concluded that Rafael would not have exhibited the type of behavior problems manifested in the developmental kindergarten if appropriate programs had been specifically designed for him. Both Drs. McGregor and Brown concluded that Rafael's special educational, developmental, and behavioral needs could be met within the regular classroom setting with supplementary aids and services. Moreover, both emphasized that Rafael would be injured by being denied experience in a nonsegregated setting.

Additionally, both of these experts emphasized that children with even more profound disabilities than Rafael have been successfully included within regular education programs with supplementary aids and services in many communities when the communities themselves received the proper support and assistance. Dr. Brown noted that such support was available to communities in New Jersey.[24] We note that these experts challenged the School District's view that readiness for mainstreaming or inclusion could successfully be developed within a segregated setting and argued that it is illusory, and perhaps even pretextual, to contend that segregation can breed readiness for inclusion.[25]

---

**24.** The New Jersey Department of Education is committed to "make available the option of regular class placement with supports for all pupils for whom it would be appropriate," and has already begun training school districts to "develop[ ] a capacity to provide effective inclusive education programs for pupils with moderate to serious disabilities." *See* Memorandum of Jeffrey V. Osowski, Director, Division of Special Education, February 6, 1992, attached to Affidavit of Lou Brown, Ph.D.

**25.** The Obertis' experts do not rule out the possibility of an inclusive IEP with certain supplementary aids and services provided outside of the regular classroom. When the child is included as a full member of a regular classroom, however, the delivery of such services technical-

In sum, the School District and its experts argue that inclusion of Rafael is not feasible; that Rafael is too severely disabled and too unruly to be educated within the matrix of a regular education class; and therefore that he is in need of special education services that can only be provided in a small, self-contained special education class. In the School District's view, this is the only hope of developing even minimal readiness for mainstreaming in the future. Rafael's experts, on the other hand, attest that inclusion of children like Rafael has been and can be successfully accomplished.

### D. Matters in Dispute

The Obertis having challenged the School District's current placement for Rafael, which calls for a most restrictive setting, the School District must justify its conclusion that it is not feasible to place Rafael within a regular class in his local school with supplementary aids and services. We believe that the parties have raised questions of fact material to this issue, and therefore the motions for summary judgment filed by both parties must be denied.

There is no dispute as to whether the school district considered less restrictive placements for Rafael in anticipation of the 1989–1990 school year. It did not. There is no dispute as to the level of supplementary aids and services the School District provided for Rafael during his year in the developmental kindergarten. As we have already indicated, the level of assistance provided was insufficient. Finally, although the School District allegedly considered less restrictive placements for Rafael for the 1990–1991 school year, there is no question that this placement decision was substantially and improperly influenced by the behavior problems Rafael manifested during the developmental kindergarten year.[26] Accordingly, we do not believe that any of the School District's placement decisions for Rafael can stand scrutiny under the standards of the IDEA. It does not appear that either the procedural or mainstreaming requirements of the Act were satisfied with respect to any of the IEPs promulgated for Rafael.

However, it does appear to us that genuine questions of material fact have been raised about the feasibility of including Rafael in a regular classroom setting now. Moreover, this is a particularly fact-sensitive issue, and one that requires expert evidence. Although there may not be a dispute as to the severity of Rafael's disability, obviously the experts disagree as to whether Rafael can be included in a regular classroom and as to what types of supplementary aids and services might be employed to facilitate such a placement.[27] Thus, the School District has failed to establish that there is no disputed question of material fact with respect to whether the current IEP is appropriate, and the Obertis have failed to establish that there is no disputed question of material fact with respect to whether it is feasible to offer Rafael an inclusive placement in his local school. A plenary hearing will therefore be required in order for the court to make these determinations.

### IV. Section 504 of the Rehabilitation Act

■ The Obertis have also brought discrimination claims against the School District pursuant to section 504 of the Rehabilitation Act, 29 U.S.C. § 794.[28] Although

---

ly remain within the matrix of the regular class, and the child need not be viewed, by other students or by himself or herself, as an outsider.

26. The conclusions of both the ALJ and the School District's expert, Dr. Urban, were also largely influenced by Rafael's behavior problems in the developmental kindergarten.

27. We note that the expert opinions here may represent "conflicting educational philosophies." Of course, to the extent that the experts recruited by the Obertis express a preference for inclu-

sion, this "is a preference shared by Congress and embodied in the IDEA." *Board of Education, Sacramento City Unified School District v. Holland,* 786 F.Supp. at 881 (E.D.Cal.1992).

28. This statute provides, in part, that:
No otherwise qualified individual with handicaps in the United States ... shall, solely by reason of her or his handicap, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.
29 U.S.C. § 794(a).

there are a number of distinct issues related to this claim, it appears to us that, like the IDEA, section 504 would require inclusion of Rafael within a regular class in his local school if feasible.[29] *See Alexander v. Choate*, 469 U.S. 287, 300 n. 19, 105 S.Ct. 712, 717 n. 19, 83 L.Ed.2d 661 (1985) (provider must make "reasonable modifications in its programs" to accommodate individuals with disabilities); 34 C.F.R. § 104.34 (segregated school services permissible only if school district demonstrates "that the education of the person in the regular educational environment ... with the use of supplementary aids and services cannot be achieved satisfactorily"); 34 C.F.R. § 104(b)(2) (requiring equal educational opportunity "in the most integrated setting appropriate to the person's needs").

As this is the precise issue we have reserved for trial with respect to the Obertis' IDEA claim, it too is unripe for summary judgment.

## V. *Conclusion*

We have identified various ways in which the School District has, since 1989, violated the procedural and mainstreaming requirements of the IDEA with respect to Rafael's education. Still, the question remains as to what is the most appropriate placement for Rafael now. A new IEP must therefore be generated after the court determines whether it is feasible for the School District, in collaboration with the Obertis, to devise an IEP for Rafael which will provide integrated educational services and activities at his local elementary school, with nondisabled children, to the maximum extent appropriate, with the use of supplementary aids and services as necessary. According to the goals and requirements of the IDEA, we will first direct our attention to whether and to what extent Rafael can be included within the matrix of a regular

class and to what supplementary aids and services would be necessary to accomplish this. Rafael's unhappy experience in Clementon's developmental kindergarten may no longer be used as a basis for justifying his exclusion from mainstream programming.

It is regretful that this matter has ended up in litigation where the parties are pitted against each other instead of working together. It is difficult to imagine a worse scenario from the point of view of Rafael.[30] Creating accommodations for children with disabilities within mainstream education programs is a challenge for all involved, and we are sure, if of nothing else, that in the process both parties need all the help they can get.

An appropriate order shall be entered, and this matter shall be set down for a plenary hearing on an expedited basis.

---

29. In the context of section 504, accommodation for "otherwise qualified" individuals with disabilities must be undertaken unless such accommodation "would require either a modification of the essential nature of the program, or impose an undue burden on the recipient of federal funds." *Strathie v. Department of Transportation*, 716 F.2d 227, 231 (3d Cir.1983).

30. In fact, Rafael's attorney has informed the court that due to the Obertis' dissatisfaction with the School District's segregated placement recommendation for the 1991–1992 school year, which was affirmed by the ALJ, they have reluctantly opted to educate Rafael at home pending resolution of this matter.