

2006 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

1-23-2006

# L.E. v. Ramsey Bd Ed

Precedential or Non-Precedential: Precedential

Docket No. 05-1157

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2006

Recommended Citation

"L.E. v. Ramsey Bd Ed" (2006). *2006 Decisions.* Paper 1662.
http://digitalcommons.law.villanova.edu/thirdcircuit_2006/1662

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2006 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———

No. 05-1157

———

L. E.; E. S., Individually and as the Parents
and Natural Guardians of M.S., a minor,
                                    Appellants

v.

RAMSEY BOARD OF EDUCATION; BRUCE DeYOUNG,
Individually  and as Superintendent of Schools; FREDERICKA
SHPETNER, Individually and as Director
of Special Services; JOAN W. MOORE, Individually and
as Learning Disabilities Teacher-Consultant and Case Manager

———

On Appeal from the United States District Court
for the DISTRICT OF NEW JERSEY
(D.C. No. 03-cv-02605)
District Judge: Honorable Hon. Faith S. Hochberg

———

Submitted Under Third Circuit LAR 34.1(a)
November 17, 2005
Before: BARRY and AMBRO, Circuit Judges, and POLLAK,[*]
District Judge

(Opinion Filed: January 23, 2006 )

———

———

[*]The Honorable Louis H. Pollak, District Judge, United
States District Court for the Eastern District of Pennsylvania,
sitting by designation.

Lisa K. Eastwood, Esq.
Eastwood, Scandariato & Steinberg
723 Kennedy Boulevard
North Bergen, NJ 07047

Counsel for Appellants


Eric L. Harrison, Esq.
Methfessel & Werbel
3 Ethel Road
P.O. Box 3012, Suite 300
Edison, NJ 08818

Counsel for Appellees


Bryan P. Schroeder, Esq.
Saiber, Schlesinger, Satz & Goldstein
One Gateway Center, Suite 1300
Newark, NJ 07102-5311

Counsel for Amicus on behalf of Appellants

---

OPINION OF THE COURT

---


BARRY, Circuit Judge

Appellants L.E. and E.S., parents of M.S., brought this action against the Ramsey Board of Education ("the Board") and individual employees of the Board, appellees herein, alleging violations of the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 *et seq.* They now appeal a decision of the United States District Court for the District of New Jersey granting summary judgment to appellees and denying it to them. We will affirm.

2

# I. BACKGROUND

M.S. is the focus of this case. He is a young boy, born December 29, 1998, who before the age of three presented "a static encephalopathy of prenatal but uncertain etiology . . . coupled with autistic-like behaviors," which was "suggestive but not diagnostic of an autistic spectrum disorder." (A1422.) His physician alternatively posited a diagnosis "of speech and language dysfunction involving both receptive and expressive language." (*Id.*) Appellants, in the words of the Administrative Law Judge ("ALJ"), "have been commendably dedicated to learning about their son's disabilities and pursuing the best educational and related services available." (A61.) They provided their son with early therapeutic services, such as speech, occupational, and physical therapy. In addition, in the fall of 2001, before M.S. turned three, appellants enrolled him in preschool programs at the Pinnacle Learning Center, the CT Center, and JCC on the Palisades.

When M.S. became eligible for special education and related services under the IDEA upon turning three, appellants continued to be actively involved in the process of determining how best to proceed with his education. Indeed, both before and after his third birthday, a Child Study Team ("CST") held a series of meetings with and without his parents "for the purposes of determining [his] eligibility for special education and related services and developing an [individualized education program ("IEP")] for [him]." (Appellants' Br. at 7.) The dispute in this case arises out of appellants' disagreement with the CST's assessment of what educational setting and related services would be appropriate for their son. As is, sadly, seen so often in cases brought under the IDEA, this case, from the outset, has been both difficult and emotionally charged.

The Ramsey CST received opinions from a number of professionals regarding the proper placement for M.S. Laurie Podd, a classroom teacher at a mainstream preschool where M.S. spent time prior to his third birthday, believed he was

progressing on pace.[1]  An early enrichment teacher of M.S., Brenda Brawer, believed in November of 2001 that M.S. "would benefit from the educational and social experiences which could be provided in a typical preschool if he was accompanied by a 'shadow' trained in behavioral intervention." (A1442.)  M.S.'s developmental pediatrician, Dr. Debra E. Seltzer, also opined that he "would benefit most from daily contact with typically developing peer role models in a supportive, nurturing environment." (A1425.)  "A preschool handicapped class would therefore not provide the most appropriate educational setting for" M.S.  (*Id.*)  His speech therapist joined those advocating for an "integrated preschool program." (A1440.)  In light of these opinions, appellants sought to have M.S. continue in the Pinnacle program with a shadow.

The CST, however, advocated for a segregated placement.  In support of that position, appellees point to the assessments conducted by social worker Stacy McDonough, psychologist Stacie Greenberg, and learning disabilities teacher-consultant and case manager Joan Moore.   The consensus of that group, in the opinion of Ms. McDonough, was that M.S. would benefit most from a preschool setting "that utilizes a more one-to-one approach and incorporates both language and frequent refocusing in order to continue to develop age appropriate skills for attention and communication." (A1512.) The group was also concerned that his then-full schedule of services and activities arranged by appellants was too burdensome for him.  On December 11, 2001, Ms. Moore, on behalf of the CST, circulated an IEP providing for a half day at the Hubbard School, a self-contained class of children with disabilities run by Ramsey with supplemental, related services infused into the day.

Appellants rejected that proposal, believing that M.S.

---

[1]Appellees point out that as of November 15, 2001, Ms. Podd's evaluation of M.S. was not uniformly positive.  While that is true, we believe appellants fairly characterize her assessment of M.S.

could continue to succeed and develop in a mainstream classroom setting and would benefit from modeling the mainstream student population. They also were not satisfied with the providers of the supplemental services offered by Ramsey. In light of that rejection, the CST met without appellants on January 3, 2002 and subsequently sent appellants a revised IEP. Although the opinions of outside experts were included in the revised IEP, the recommendations were materially the same. The IEP did, however, note appellants' desired placement and the CST's "anticipat[ion] that an integrated preschool may be appropriate in September [2002]." (A1584.) Appellants again rejected the IEP, opting to continue M.S.'s education in the programs in which he was already enrolled and provide additional services through private professionals.

Despite their collective opinion, appellees endeavored, in light of appellants' wishes, to find a spot for M.S. in an integrated classroom for that spring. They discovered that a program in Garfield, New Jersey, had an opening. Garfield, however, rejected M.S., believing he was not yet ready for its program.[2] Appellees continued to attempt to resolve their differences with appellants and Ramsey's Director of Special Services, Fredericka Shpetner, secured a spot for M.S. in an integrated classroom in Park Ridge starting in September 2002. That placement was included in an IEP presented to appellants on July 22, 2002. Although pleased with the placement, appellants were not completely satisfied. They believed that the provision of supplemental services was inadequate because they could not be confident of the qualifications of the unnamed providers. Appellants also believed that the goals included within the IEP did not adequately account for the gains M.S. had made during the spring.[3] Consequently, while accepting the

---

[2]Appellants contend that Garfield's Learning Consultant was biased against M.S. due to prior dealings with the family. The ALJ found this contention to be groundless.

[3]Appellees note that they had limited ability to assess M.S.'s development at that point in light of appellants' decision to have

Park Ridge program, appellants made their own plans for the provision of supplemental services.

## II. LEGAL FRAMEWORK

### A.     Jurisdiction and Standard of Review

The District Court exercised jurisdiction under 20 U.S.C. § 1415, and we have jurisdiction under 28 U.S.C. § 1291.

When deciding an IDEA case, the District Court applies a modified version of *de novo* review and is required to give due weight to the factual findings of the ALJ. *See S.H. v. State-Operated Sch. Dist. of the City of Newark*, 336 F.3d 260, 269-70 (3d Cir. 2003); *see also Board of Educ. v. Rowley*, 458 U.S. 176, 206 (1982); *Shore Regional High Sch. Bd. of Educ. v. P.S.*, 381 F.3d 194, 199 (3d Cir. 2004) (describing the District Court's burden as "unusual" insofar as it "must make its own findings by a preponderance of the evidence" but "must also afford 'due weight' to the ALJ's determination").[4]  On review, "we of course

M.S. receive services from non-Ramsey providers.

[4]     "In addition, if a state administrative agency has heard live testimony and has found the testimony of one witness to be more worthy of belief than the contradictory testimony of another witness, that determination is due special weight.  Specifically, this means that a District Court must accept the state agency's credibility determinations 'unless the non-testimonial, extrinsic evidence in the record would *justify* a contrary conclusion.' (emphasis added).  In this context the word 'justify' demands essentially the same standard of review given to a trial court's findings of fact by a federal appellate court."

6

exercise plenary review with respect to the question whether the District Court applied the correct legal standards under the IDEA, but we review the District Court's factual findings for clear error." *Shore Regional*, 381 F.3d at 199 (citations omitted); *see id.* ("'A finding of fact is clearly erroneous when, after reviewing the evidence, the court of appeals is left with a definite and firm conviction that a mistake has been committed.'") (citation omitted).

## B.    IDEA

The IDEA implements the congressional determination that "[i]mproving educational results for children with disabilities is an essential element of our national policy of ensuring equality of opportunity, full participation, independent living, and economic self-sufficiency for individuals with disabilities." 20 U.S.C. § 1400(c)(1). To that end, the statute requires, in relevant part, that states receiving federal funding under the statute must have "in effect policies and procedures to ensure that . . . [a] free appropriate public education is available to all children with disabilities . . . ." 20 U.S.C. § 1412(a)(1)(A). "An individualized education program, or an individualized family service plan . . . [must be] developed, reviewed and revised for each child with a disability . . . ." 20 U.S.C. § 1412(a)(4). The education of disabled students must "[t]o the maximum extent appropriate" be provided "with children who are not disabled." 20 U.S.C. § 1412(a)(5)(A) ("[S]pecial classes, separate schooling, or other removal of children with disabilities from the regular educational environment occurs only when the nature or severity of the disability of a child is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily.").

When a state fails to provide a free appropriate public education ("FAPE"), it must reimburse parents for resulting private school costs. *See T.R. v. Kingwood Township Bd. of Educ.*, 205 F.3d 572, 577 (3d Cir. 2000) (citing *Burlington v.*

---

*Shore Regional*, 381 F.3d at 199 (citations omitted).

7

*Dep't of Educ. of Commonwealth of Mass.*, 471 U.S. 359, 370 (1985)). A FAPE is an education "specially designed to meet the unique needs of the handicapped child, supported by such services as are necessary to permit the child 'to benefit' from the instruction." *Rowley*, 458 U.S. at 188-89. "The education provided must 'be sufficient to confer some educational benefit upon the handicapped child,' although the state is not required to 'maximize the potential of handicapped children.'" *Kingwood Township*, 205 F.3d at 577 (citations omitted). At one time, we only required that a child's IEP offer "more than a trivial or de minimis educational benefit," *Oberti v. Bd. of Educ. of Borough of Clementon Sch. Dist.*, 995 F.2d 1204, 1213 (3d Cir. 1993); more recently, however, we have "squarely held that 'the provision of merely "more than a trivial educational benefit" does not meet' the meaningful benefit requirement of *Polk* [*v. Central Susquehanna Intermediate Unit 16*, 853 F.2d 171 (3d Cir. 1988)]." *Kingwood Township*, 205 F.3d at 577 (quoting *Ridgewood Bd. of Educ. v. N.E.*, 172 F.3d 238, 247 (3d Cir. 1999)).

The mainstreaming component of the IDEA "require[s] that a disabled child be placed in the least restrictive environment [("LRE")] that will provide him with a meaningful educational benefit."[5] *Kingwood Township*, 205 F.3d at 578. To that end, disabled children shall be, "to the greatest extent possible, satisfactorily educate[d] . . . together with children who are not disabled, in the same school the disabled child would attend if the child were not disabled." *Carlisle Area Sch. v. Scott P.*, 62 F.3d 520, 535 (3d Cir. 1995). To determine whether a state is complying with the LRE requirement, we first ask "'whether education in the regular classroom, with the use of supplementary aids and services, can be achieved satisfactorily.'" *Oberti*, 995 F.2d at 1215 (citation omitted). To enable us to answer that question, we consider "(1) the steps the school district has taken to accommodate the child in a regular

---

[5]"[T]his provision sets forth a 'strong congressional preference' for integrating children with disabilities in regular classrooms." *Oberti*, 995 F.2d at 1213-1214.

classroom; (2) the child's ability to receive an educational benefit from regular education; and (3) the effect the disabled child's presence has on the regular classroom." *Kingwood Township*, 205 F.3d at 579.

A word about the first and second factors. In considering the former, a court must determine whether the school district provides "a continuum of alternative placements . . . to meet the needs of handicapped children. . . ." 34 C.F.R. § 300.551(a). This continuum must include "the whole range of supplemental aids and services." *Oberti*, 995 F.2d at 1216 (quotations and citation omitted). The second factor entails a comparison between the benefits of a mainstream placement and a special education classroom. *See id.* ("The court will have to rely heavily in this regard on the testimony of educational experts."). The unique benefits that will accrue to the child in a mainstream classroom also must be considered. *Id.* at 1216-17. "Thus, a determination that a child with disabilities might make greater academic progress in a segregated, special education class may not warrant excluding that child from a regular classroom environment." *Id.* at 1217. If a court finds that a child cannot be satisfactorily educated in a regular classroom, it must then determine "'whether the school has mainstreamed the child to the maximum extent appropriate,' i.e., whether the school has made efforts to include the child in school programs with nondisabled children whenever possible." *Id.* at 1215 (citation omitted).

We have noted that the mainstreaming issue is a difficult one "in light of the apparent tension within the Act between the strong preference for mainstreaming and the requirement that schools provide individualized programs tailored to the specific needs of each disabled child." *Id.* at 1214 (citations omitted). As we advised in *Oberti*:

> The key to resolving this tension appears to lie in the school's proper use of 'supplementary aids and services,' which may enable the school to educate

a child with disabilities for a majority of the time within a regular classroom, while at the same time addressing that child's unique educational needs.

*Id.* (citation omitted). In sum, a court determines, through a comparison of educational opportunities supported by expert testimony, whether the child can be satisfactorily educated in a regular classroom with supplemental services. If it finds that the child cannot be satisfactorily educated in that manner, the court must consider whether the school attempted to mainstream the child to the maximum extent possible.

## C.     Burden of Proof

We have always placed the burden of demonstrating compliance with the IDEA on the school district. *See Kingwood Township*, 205 F.3d at 579; *Oberti*, 995 F.2d at 1219. While this appeal was pending, however, the Supreme Court held that the "burden of proof in an administrative hearing challenging an IEP is properly placed upon the party seeking relief." *Schaffer v. Weast*, 126 S.Ct. 528, 537 (2005). The *Schaffer* Court declined to address the issue of whether a state could, by statute, place the burden exclusively upon the school district. *Id*. New Jersey has no such statute. Nevertheless, appellants contend that the rule in *Lascari v. Bd. of Educ.*, 116 N.J. 30 (1989), where the Supreme Court of New Jersey placed the burden on the school district regardless of which party sought relief, is unaffected by *Schaffer*. Appellants thus attempt to avoid the application of *Schaffer* by arguing that it "does not provide the rule of law in New Jersey." (Appellants' Letter Br.)[6]

That argument is unavailing. The Court in *Schaffer* saw no reason to depart from "the ordinary default rule that plaintiffs bear the risk of failing to prove their claims," 126 S.Ct. at 534,

---

[6]We provided the parties an opportunity to supplement their briefing in the wake of the decision in *Schaffer*.

leaving for another day whether a state can overcome that rule by statute. *Lascari* addressed that very question: where, in the absence of a federal or state statutory provision providing otherwise, should the burden of proof rest when the appropriateness of an IEP is challenged? Citing state and federal statutory and regulatory schemes implementing not the IDEA, but its precursor, the *Lascari* Court determined that placing the burden upon the school district was most appropriate. *See Lascari*, 116 N.J. at 44-46. *Schaffer* rejected that conclusion. Because this case is brought solely under the IDEA and arises in a state lacking a statutory or regulatory provision purporting to define the burden of proof in administrative hearings assessing IEPs, *Schaffer* controls.[7]

Appellants would also have us limit the holding in *Schaffer* to the FAPE aspect of the analysis. Although, to be sure, the facts in *Schaffer* implicated only the FAPE analysis, the Supreme Court made it quite clear that its holding applied to the appropriateness of the IEP as a whole. Appellants quote limiting language – "We hold no more than we must to resolve the case at hand," *Schaffer*, 126 S.Ct. at 537– in arguing that the decision does not reach the LRE analysis. The Court's holding, which directly followed the quoted language, however, vitiates that attempt: "The burden of proof in an administrative hearing *challenging an IEP* is properly placed upon the party seeking relief." *Id.* (emphasis added). It would be unreasonable for us to limit that holding to a single aspect of an IEP, where the

---

[7]The *Lascari* Court described "the education of handicapped children" as "an exercise in cooperative federalism." *Lascari*, 116 N.J. at 33. It noted, however, that the relevant state and federal statutes and regulations did not "address the basic issue before" it, namely, "the allocation of the burden of persuasion or proof." *Id.* at 43. *Lascari* filled that gap, providing the default rule previously applied by us as well. *Schaffer* precludes our continued application of that rule, at least to the facts of this case.

11

question framed by the Court,[8] and the answer it provided, do not so constrict the reach of its decision.[9]

Consequently, appellants bear the burden of proof when challenging the appropriateness of the relevant IEPs. In the proceedings before both the ALJ and the District Court, the burden was placed upon appellees and, in both proceedings, appellees prevailed. What may have been a close case pre-*Schaffer* is, in the wake of *Schaffer*, no longer so. As we discuss below, appellants have not carried their burden on the question of the appropriateness of the relevant IEPs.

---

[8]The Court "granted certiorari to resolve the following question: At an administrative hearing assessing the appropriateness of an IEP, which party bears the burden of persuasion?" *Schaffer*, 126 S.Ct. at 533 (citation omitted).

[9]Appellants also argue that, in the event *Schaffer* is deemed applicable and their evidence is found to be insufficient, the case should be remanded "because this case was tried under controlling law which imposed the burden of proof on the school district." (Appellants' Letter Br.) Appellants do not, however, give any indication of what "additional evidence" they would be able to produce or why, regardless of where the burden is placed, they would not have submitted that evidence in pressing their claim during the prior proceedings.

## III. ANALYSIS[10]

Appellants contend that their son was denied a free appropriate public education in the least restrictive environment due to an invalid assessment of his individual needs and pursuant to an overarching policy against the integration of disabled students. The ALJ, after holding a six-day hearing, rejected these contentions in a lengthy and extraordinarily thorough opinion, and the District Court affirmed.

### A.    Spring 2002 IEP

The central questions in the proceedings before the ALJ and the District Court were whether the Board carried its burden of demonstrating that in the spring of 2002 M.S. could not be satisfactorily educated "in the regular classroom, with supplementary aids and support services," *Oberti*, 995 F.2d at 1207, and whether he was, to the maximum extent appropriate, educated with nondisabled students. Both the ALJ and District Court, having placed the burden on the Board, found that it had done so.

Appellants contend that the District Court improperly affirmed the ALJ's conflation of the FAPE analysis with the LRE analysis. They point to the following language in the ALJ's decision: "the relevant inquiry is not whether the program established for M.S. by his parents was 'better' for M.S.; but

---

[10]An amicus brief in support of appellants details the benefits realized by disabled children when fully included in mainstream educational environments. We do not question the intent of the IDEA, as explicitly stated in the statute, to ensure that disabled students are educated "to the maximum extent appropriate" with nondisabled students. Our role here is simply to review, under the applicable standard of review, the District Court's application of that statutory scheme to the facts of this case. On that issue, the amicus brief offers little guidance.

13

whether the placement of M.S. in the Hubbard program for the spring semester of 2002 was appropriate." (A64.) Appellants are correct that whether an education is "appropriate" for purposes of the FAPE analysis and whether a student has been integrated "to the maximum extent appropriate" are distinct questions. Their argument, however, that the analyses were conflated is unavailing. The ALJ accurately outlined the appropriate standards and then, in applying them, demonstrated an understanding of what the statute required. In stating the framework for decision, the ALJ correctly distinguished between the FAPE and LRE analyses, and properly distilled the question before her as "whether the Hubbard School placement was the least restrictive environment . . . in which M.S. could receive a FAPE." (A54; *see* A54-57 (detailing the analytical steps required by relevant Third Circuit precedent).)

The ALJ's later indication that "the relevant inquiry is not whether the program established for M.S. by his parents was 'better' for M.S., but whether the placement of M.S. in the Hubbard program for the spring semester of 2002 was appropriate," does on its face appear to conflate the sufficiency of the educational benefits for purposes of FAPE analysis with whether M.S. could be more fully mainstreamed while still receiving a FAPE. Nevertheless, in light of the ALJ's earlier detailed and accurate recitation of the relevant standards, this language is most fairly read to address only the question of whether the Hubbard Program was appropriate. The ALJ, as evidenced by her careful review of the testimony and ultimate conclusion that "M.S. could not receive a satisfactory educational opportunity in a less restrictive environment," (A65), demonstrated an understanding of the distinct LRE issue in play.

The District Court considered and explicitly rejected the argument appellants raise here, namely that the ALJ did not separately address the LRE question. The Court was convinced, as are we, that the ALJ properly understood the legal framework and addressed in all material respects the facts in that light. The ALJ, the Court found, "credit[ed] the testimony of educational experts who had observed M.S." and "held that the CST

14

seriously considered and reconsidered less restrictive placements for M.S. prior to offering placement at the Hubbard Program." (A97.) In the end, however, the CST "determined that such a placement would not provide him with satisfactory educational opportunities." (*Id.*) We believe that both the ALJ and the District Judge apprehended, and in all material ways applied, the appropriate legal standards. What remains for us to decide is whether the factual findings of the ALJ, as affirmed by the District Court (i.e., finding appellees' witnesses more credible and compelling with regard to whether M.S. could receive a FAPE in a less restrictive environment) were clearly erroneous.

The ALJ and the District Court relied upon evidence supporting a finding that M.S. could not receive a satisfactory education in the regular classroom and that the IEP adopted by appellees provided for an education in the LRE. That evidence, as outlined by the ALJ, included the testimony of officials and educators who recounted their opinion that the Hubbard School was the most inclusive environment in which M.S. could receive an appropriate education.

In appellants' estimation, however, the record is "devoid of any evidence to support a finding that [M.S.] could not have been educated satisfactorily in a regular classroom with supplementary aids and services." (Appellees' Br. at 23.) They ask us to find that the Board predetermined that M.S. would be in a segregated environment. In support of that contention, they quote Ms. Moore's deposition testimony that she did not interview the Pinnacle staff to determine whether M.S. could continue there with supplemental aids and services. That testimony, however, is simply not enough to call into question, much less to counter, the evidence and testimony found credible by the ALJ, who opined that M.S. could not receive an appropriate education in an environment less restrictive than the Hubbard School program. The fact that appellants disagree does not make that evidence less substantial or render it insufficient to support a grant of summary judgment.

Appellants also argue that the Board was being disingenuous when it agreed to find an integrated placement for M.S. in February 2002. We summarily reject that argument. The Board offered its opinion regarding the proper placement of M.S. and appellants turned it down. In light of that rejection, the Board made efforts to accommodate appellants' wishes; indeed, the efforts made on M.S.'s behalf in February 2002 were quite appropriately treated by the ALJ and the District Court as evidence of the Board's good faith attempts to find a placement acceptable to appellants who, as parents, have an integral role in the statutory scheme, while maintaining its view that that placement was not appropriate for M.S. Moreover, the ALJ and the District Court found that the Board considered a full range of options for M.S., giving his situation the individualized assessment required by the IDEA.

In sum, the Board did not believe that M.S. could receive an appropriate education in an integrated classroom with supplemental services. The ALJ, in the end, was persuaded by the testimony on behalf of the Board and rejected that offered by appellants. The District Court believed that the ALJ's findings were supported by the record. We see no basis, particularly in the wake of *Schaffer*, to upset those findings. *Cf. Oberti*, 995 F.2d at 1222 ("In short, the parties' experts disagreed on the respective benefits of a segregated versus an integrated placement for [the student], and the district court was in a better position than we are to evaluate their testimony. We therefore defer to that court's findings, which, at all events, are not clearly erroneous.").

## B.     Partial Reimbursement

The ALJ found in favor of appellants on the question of whether the IEP offered adequate speech therapy, a finding affirmed by the District Court. The ALJ determined that "M.S. suffered from severe articulation problems, which required that he receive more individual speech therapy than . . . offered in the IEP." (A66.) She therefore ordered the Board to partially

reimburse appellants for the difference between the amount of time offered and the amount of time M.S. should have been offered for speech therapy.

Appellants have concluded from this that the ALJ "[a]llow[ed] the Board a credit for speech therapy from which the ALJ explicitly determined M.S. would not benefit, in the absence of any claim or evidence that the speech therapy provided by M.S.' parents was inappropriate . . . ." (Appellants' Br. at 51.) The ALJ clearly stated, however, that M.S. needed more speech therapy than provided by the Board, not that the Board's therapy provided no benefit. We agree with the ALJ and the District Court that partial reimbursement was appropriate.[11]

## C.    2002-2003 IEP

Appellants also dispute the adequacy of the Board's IEP for the 2002-2003 school year.[12] As noted above, M.S. began at an integrated placement in September 2002 and was offered supplemental services by the Board. Appellants were satisfied with the placement but objected to the provision of services by unnamed professionals, arguing that the Board failed to establish through its IEP that the providers would be able to provide him with a FAPE. They contend that the ALJ incorrectly found that

---

[11]The Board's inability to carry what was then its burden on this question before the ALJ does not necessarily lead to the conclusion that appellants on remand would be able to carry what is now their burden. In their letter brief following *Schaffer*, however, appellees did not request that this aspect of the case be remanded for proceedings under the burden of proof announced in *Schaffer*. We, therefore, will uphold the award of partial reimbursement.

[12]Appellants take issue, as well, with the adequacy of the supplemental services provided in the spring of 2002. We have considered the arguments raised and find them unpersuasive.

an IEP need only provide "some educational benefit." (A64 ("Clearly, the program was sufficient to provide some educational benefit upon M.S.")) We see no error; indeed, the same language – "some educational benefit" – is found in our *Kingwood Township* decision. That decision clearly confirmed that "some educational benefit" requires provision of a "meaningful educational benefit," 205 F.3d at 577, the standard the ALJ clearly and accurately outlined earlier in her opinion.

The District Court's determination that the ALJ "did require the Board to adduce evidence to prove that the related services would have conferred a meaningful educational benefit to M.S." will, therefore, not be disturbed. We reject appellants' suggestion that the ALJ and the District Court were stating an *ipso facto* rule that all the Board needed to do was offer certified professionals. The District Court's opinion, for example, evidences consideration of the actual services to be provided, their adequacy, and the certification *and experience* of the providers. Moreover, that finding arose in the context of assessing whether the Board carried a burden it no longer bears. Appellants offered no evidence to the ALJ or to the District Court, and on appeal suggest none that they could offer, calling into question the qualifications of the Board's providers of supplemental services.[13]

**D.     § 1983**

Finally, we reject appellants' argument that a Board policy of segregating disabled students was behind M.S.'s placement. The District Court, finding no IDEA violation and noting the ALJ's supportable findings regarding individualized

---

[13]Appellants also believe the IEP did not include adequate measurable goals individualized to M.S. The ALJ and District Court, under the then-governing burden, found for the Board. While that finding may have presented us with a close question before, we see no basis for upsetting it now.

assessment, correctly granted summary judgment to appellees on appellants' claim brought under 42 U.S.C. § 1983.

## IV.

We will affirm the December 15, 2004 order of the District Court.